**Richard FRAZIER, Petitioner**

v.

**Betty MITCHELL, Warden, Respondent**

**No. 1:98CV2098.**

United States District Court, N.D. Ohio, Western Division.

Jan. 5, 2001.

---

David Paul Bradley, Steuer, Escovar & Berk, Cleveland, OH, Russell Adrine, Cleveland, OH, Richard M. Kerger, Kerger & Kerger, Toledo, OH, for petitioner.

Michael L. Collyer, Office of Attorney General, Cleveland, OH, Karhlton F. Moore, Office of Attorney General, Columbus, OH, for respondents.

## ORDER

CARR, District Judge.

This is a capital habeas corpus case arising from the petitioner's conviction of two counts of aggravated murder and one count aggravated burglary. The petitioner has exhausted his state court remedies.

For the reasons that follow, the petition will be denied.

### Introduction

### A Factual Background

The following summary of the evidence from the petitioner's trial is taken from the opinion of the Ohio Supreme Court affirming the petitioner's conviction on direct appeal. *State v. Frazier*, 73 Ohio St.3d 323, 323–26, 652 N.E.2d 1000 (1995).

The victim, Tiffany Skiba, lived with her grandparents, Robert and Rita Skiba, in Cleveland, Ohio. On November 8, 1990, Mr. Skiba discovered Tiffany's body in her upstairs bedroom. Death had been caused by multiple stab wounds. Four days later the petitioner, Richard Frazier, was arrested and charged with the murder.

Petitioner had been married to the victim's mother from 1980 until 1989. In

October, 1988, the Medina County, Ohio, grand jury returned a four count indictment against the petitioner. The indictment charged two counts of rape, one count of sexual battery, and one count of gross sexual imposition. The indictment named Tiffany as the victim of each offense. She allegedly had been impregnated by the petitioner.

The Medina County Court of Common Pleas ordered the petitioner to submit a blood sample for DNA testing to determine the paternity of Tiffany's child. He appealed that order to the state court of appeals and Ohio Supreme Court, which upheld the trial court's order. The United States Supreme Court denied petitioner's writ of certiorari in October, 1990. Thereafter, the Medina Court of Common Pleas ordered petitioner's blood sample to be taken on November 13, 1990. Trial on the pending indictment was set for December 5, 1990, and then continued to January 14, 1991.

While the petitioner was on bond, Tiffany and her mother, Susan Bednarski, expressed fears that petitioner might harm Tiffany. Bednarski had seen the petitioner driving slowly past their house on numerous occasions. One of Tiffany's friends also saw the petitioner driving slowly by their house. When the friend told Tiffany what she had seen, Tiffany said, "Heather, oh, my God. He found me. He is going to kill me." Petitioner also was seen following Tiffany's school bus.

From September 1989 to May 1990 Tiffany received counseling. Her counselor testified that Tiffany was suicidal in October 1989. At a conference with her mother's attorney in October 1989, Tiffany was "petrified" during a discussion concerning the appellant. At a later visitation hearing attended by the petitioner, Tiffany appeared to be upset, "pale, shaky," and "very frightened."

After Tiffany moved in with her grandparents, she told her uncle that she was afraid of petitioner and of what he might do to her. She also told him that she slept with a knife under her pillow.

On several occasions the petitioner approached Tiffany's stepfather, David Bednarski. During one of these encounters, the petitioner indicated that he wanted to resolve some legal matters. After Bednarski stated, "That's up to the state and the attorneys," the petitioner replied, "You use your attorneys. I'm going to do it in an illegal way." Petitioner's friends later threatened David Bednarski.

One week before Tiffany's murder, the petitioner sent her a Halloween card asking her to call him. Two days before the murder, the petitioner rented a car from the Cleveland airport.

On the day of the murder, Tiffany's grandfather, as was his custom, drove his wife to work around 5:00 a.m. He returned home about fifteen minutes later. On his return, Mr. Skiba noticed the family dog barking loudly and looking toward the back of the house. This behavior was unusual.

At approximately 10:00 a.m., he called to Tiffany to get up to get ready for work. Receiving no response, he went upstairs and found Tiffany's body in her bed.

Next to the body, police found a steak knife belonging to a set owned by her grandparents. The knife's blade was separated from its handle. Blood was on the bed and in the surrounding area. Police found smears of blood matching Tiffany's blood type on the right side of the stairway leading down from her second floor bedroom and on the door frame leading to the living room. Officers found human blood on the steak knife, bedroom ceiling, door frame to the rear door, and stairwell land-

ing leading upstairs. The quantity was insufficient to determine blood type.

Entry to the house occurred through a basement window. The screen had been torn from the window and the pane of glass was broken. The window was partially open. The ground near the window was disturbed, and the door, normally closed, leading from the basement into the house was ajar.

Two footprints heading away from the murder scene were found in the neighbor's garlic bed on the other side of the fence separating the Skiba residence from their neighbor's home. From plaster casts of the prints officers determined that a size nine or ten boot sold exclusively by K–Mart had made the footprints.

On the morning of the murder the petitioner went to a medical clinic to have a one-inch cut on his right wrist treated. He appeared nervous and was pacing around the room. He said that he cut his arm at approximately 7:00 a.m. while working on his truck. The wound was consistent with a stab wound.

Later that day the petitioner contacted a friend to ask him to move his car. The friend declined, having heard a news report that the petitioner was a suspect in the murder of his former stepdaughter. Petitioner then contacted another friend, Jeffrey Weisheit, about moving his car. While the friend was driving the car, police stopped him and instructed the man to get out of the car. Before the officer had the opportunity to finish his commands, Weisheit exited the car with his hands in the air and began shouting, "Don't shoot."

The night of the murder, the petitioner drove his rental car to Ned Shamon's home in Sheffield Lake, Ohio. Shamon and the petitioner returned in Shamon's wife's car to petitioner's apartment to collect various papers and articles of clothing. The petitioner spent the ensuing weekend with the Shamons.

On November 12, 1990, Shamon followed the petitioner to a gas station, where he returned the rental car. A clerk, recognizing the petitioner from news reports, called the police. The clerk provided a description of the truck that had followed the petitioner and its license plate number. Police found a human blood stain on the rental car's front passenger seat. The amount was insufficient to be typed.

After receiving the information from the clerk, the police went to Shamon's home and arrested the petitioner. Among petitioner's effects, police found a wristwatch with a human blood stain on the band, a pry bar stained with human blood, and a letter from the United States Supreme Court about the denial of his petition for certiorari.

In addition, the police found a receipt from K–Mart for a size nine boot with the same pattern on its sole as the boot which had left the print in the Skibas' neighbor's garlic garden. A knife with human blood traces and a towel smeared with petitioner's blood were found in his apartment. The blood on the knife was not suitable for typing.

Anthony Skiba, Tiffany's uncle, testified that he had shown the petitioner how to break into Skiba's residence through a basement window. The petitioner also was familiar with the basement and its storage area because he had stored personal items there while he and Tiffany's mother had been married.

On November 12, 1990, police officers read the Miranda warnings to the petitioner in the Medina County Jail. They asked petitioner a series of questions about Tiffany's murder. The officers noticed that petitioner had several bruises and abrasions on his hands and arms and a sutured cut on the outside of his right wrist.

On November 13, 1990, Cleveland police officers took the petitioner for the blood test ordered by the Medina County court. The test showed a 99.8% probability that petitioner fathered Tiffany's child.

On November 14, 1990, during a further interview with law enforcement officers, petitioner made indirectly inculpatory statements that were later introduced against him at his murder trial. At one point, he offered to tell the officers everything that happened, but wanted to do so only after he talked with an attorney. The officers then terminated the conversation.

### B. Procedural Background

Count One of the indictment charged aggravated murder, defined as a purposeful killing while committing, or attempting to commit, or while fleeing immediately after committing or attempting to commit aggravated burglary. That Count contained three death specifications: 1) the murder was committed while committing or attempting to commit or fleeing immediately after committing or attempting to commit aggravated burglary and the offender was the principal offender or committed the murder with prior calculation and design; 2) the victim was a witness and was purposely killed to prevent her testimony; and, 3) the murder was committed for the purpose of escaping trial and/or punishment for another offense committed by him, to wit, rape.

Count Two also charged aggravated murder committed purposely with prior calculation and design. Count Two contained the same death specifications as Count One.

Count Three charged appellant with aggravated burglary.

Trial lasted from August 5 through August 14, 1991. On August 16, 1991, the jury returned a verdict of guilty on all three counts and also found that the three specifications under Counts One and Two had been proven beyond a reasonable doubt.

At the mitigation hearing the petitioner made an unsworn statement denying his guilt. On August 19, 1991, the jury returned with a recommendation that petitioner be sentenced to death. The court followed the jury's recommendation, making an independent finding that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Petitioner was sentenced to death on August 29, 1991.

The court of appeals affirmed the decision of the trial court. The Ohio Supreme Court affirmed the conviction and sentence. *State v. Frazier*, 73 Ohio St.3d 323, 652 N.E.2d 1000 (1995). The United States Supreme Court denied the petitioner's petition for a writ of certiorari. *Frazier v. Ohio*, 516 U.S. 1095, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996).

On July 31, 1996, the petitioner filed a post-conviction relief petition in the trial court. Before doing so, he had filed a Motion for Expert Assistance, seeking funds to hire an investigator. The trial court denied that motion, which was renewed and again denied after the petitioner filed his post-conviction petition.

Finding that the petitioner's claims were barred by the doctrine of res judicata, the trial court dismissed the petitioner's post-conviction petition on November 26, 1996.

Thereafter, the petitioner filed a motion for relief from judgment. He based that motion on a report from a psychologist, who stated that testing should be undertaken to determine whether the petitioner was brain damaged. Petitioner also filed objections to the trial court's findings in its dismissal of the petitioner's post-conviction petition. On December 13, 1996, the trial court overruled both motions with a marginal entry.

Petitioner appealed the denial of his post-conviction petition to the court of appeals, which affirmed the trial court's decision on December 11, 1997. On April 1, 1998, the Ohio Supreme Court declined to accept petitioner's appeal for review on the basis that the petitioner had presented no substantial constitutional question.

The petitioner's habeas corpus petition asserts thirty grounds for relief, which will be discussed in the order in which they appear in the petition.

1. **Failure of the Trial Court to Give a Cautionary Instruction re. Evidence Admitted Under Ohio R. Evid. 404(B)**

Without objection at trial, evidence was admitted against the petitioner about 1) his alleged rape of Tiffany; 2) the pending state court indictment for rape; 3) the paternity of Tiffany's child; and 4) paternity testing procedures. In addition, the state's opening statement referred to petitioner's alleged sexual abuse of Tiffany, his indictment for rape, the paternity test, and the likelihood that petitioner was the father of Tiffany's child. The rape and paternity issues also were discussed by the state during the guilt and penalty phases of the trial.

The trial court ruled that the evidence was relevant to the death specifications in the murder counts of the indictment. Those specifications alleged that the murder was of a witness, and that it was committed to avoid prosecution.

No limiting or cautionary instruction was given when the evidence was admitted or discussed. In addition to not objecting to the admissibility of the evidence, the petitioner did not ask the court to give such instruction. As a result, the Ohio Supreme Court ruled that this claim was procedurally defaulted. Accordingly that court declined to consider this claim on its merits, except to examine it on the basis of a possible manifest miscarriage of justice.

*Frazier,* 73 Ohio St.3d at 339, 652 N.E.2d 1000. The court found no miscarriage of justice.

■ Review by a state supreme court of an otherwise procedurally defaulted claim to determine whether the error, if any, constituted a manifest miscarriage of justice does not revive the defaulted claim for purposes of federal habeas corpus review. *Paprocki v. Foltz,* 869 F.2d 281, 285 (6th Cir.1989); *see also Scott v. Mitchell,* 209 F.3d 854, 868 (6th Cir.2000) ("manifest injustice" review by Ohio Supreme Court of defaulted claim does not constitute waiver of the default).

■ In any event, even if the claim could be considered on its merits, despite the default, it is without merit. The Ohio Supreme Court has expressly declined to impose a duty on Ohio's trial judges to give a limiting instruction sua sponte when, without a request for such instruction, evidence comes in under Ohio R. Evid. 404(B). *State v. Schaim,* 65 Ohio St.3d 51, 61–62 n. 9, 600 N.E.2d 661 (1992). As the Ohio Supreme Court has pointed out, "the decision not to request a limiting instruction is sometimes a tactical one, and we do not wish to impose a duty on the trial courts to read this instruction when it is not requested." *Id.* Thus, the trial court in this case complied with state law when it did not sua sponte give a limiting or cautionary instruction about this evidence.

The foregoing discussion assumes, moreover, that the petitioner properly characterizes this evidence as having been admitted under Rule 404(B). His characterization is incorrect.

■ The Ohio Supreme Court noted in its decision on petitioner's direct appeal that the evidence of the blood test was admitted properly under Rule 404(B) to show motive. In addition, the Court stated that evidence about the rape prosecu-

tion "is inextricably linked to the circumstances surrounding [the] murder." As the Ohio Supreme Court in the context of a death penalty case has since made clear, evidence of motive that is "inextricably linked" to the circumstances of a charge offense is not governed by Rule 404(B). *State v. Coleman,* 85 Ohio St.3d 129, 140, 707 N.E.2d 476 (1999). In *Coleman,* the Supreme Court, citing its earlier decision in the petitioner's direct appeal, stated:

> The admission of the underlying facts regarding the three separate drug sales tended to prove the essential elements of the specification. R.C. 2929.04(A)(8) requires that the state prove motive, and evidence was introduced to demonstrate that [the defendant] was the key witness against appellant and that her murder would hinder the state's case against him by preventing her testimony, which explained appellant's motive and deep obsession with killing Stevens. Thus, the drug sales are not considered "other acts" evidence limited by Evid. R. 404(B); rather, they were introduced to prove the R.C. 2929.04(A)(8) death-penalty specification.

(*citing State v. Frazier,* 73 Ohio St.3d 323, 338–339, 652 N.E.2d 1000 (1995)). *Accord State v. Keene,* 81 Ohio St.3d 646, 661, 693 N.E.2d 246 (1998) (evidence that a victim was murdered because she was a witness to a crime charged to the defendant not Rule 404(B) evidence).

■ Even if the evidence came in under Rule 404(B), the petitioner has not met his burden of showing that the federal Constitution requires, as a matter of due process of law, that the trial court sua sponte had to give a limiting instruction. The petitioner, rather, simply argues that he was entitled to a sua sponte limiting instruction under *Spencer v. Texas,* 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967), and *Murray v. Superintendent, Kentucky State Penitentiary,* 651 F.2d 451, 453 (6th Cir.

1981). Both cases involved habitual offender prosecutions. In *Spencer* the Supreme Court noted the efficacy and effectiveness of limiting instructions relating to evidence of prior convictions in an habitual offender prosecution. In *Murray* the court stated that, in such prosecutions, "it is unfair—and violative of due process—if evidence of other crimes is admitted without a limiting instruction." 651 F.2d at 453.

The statement in *Murray* was dictum. Neither it nor the Supreme Court's decision in *Spencer* establishes, as a matter of federal constitutional law, an entitlement to a sua sponte instruction whenever evidence is admitted under the "other acts" doctrine, as embodied in Ohio R. Evid. 404(B). As a matter of federal evidentiary law, moreover, the Sixth Circuit has held that no sua sponte instruction is required when evidence is admitted under Fed. R.Evid. 404(b). *United States v. Cooper,* 577 F.2d 1079, 1088–89 (6th Cir.1978). There is, accordingly, no constitutional right to a sua sponte instruction limiting consideration of other acts evidence.

Having failed to show an established constitutional right to such instruction, petitioner is entitled to habeas relief only if the trial court's failure to give such instruction resulted in a fundamentally unfair trial. *See Smith v. Gibson,* 197 F.3d 454, 460 (10th Cir.1999). The failure to give a limiting instruction about the rape, pending indictment, blood test, and putative paternity did not result in a fundamentally unfair trial in view of the direct connection between that evidence, petitioner's motive, and the killing. *Cf. Amos v. State,* 849 F.2d 1070, 1073 (8th Cir.1988) (no denial of right to a fair trial when trial court did not sua sponte give a limiting instruction about prior crimes evidence offered for impeachment pursuant to state evidentiary rule).

### 2. Admission of Evidence of Victim's Pre–Homicide Fear

Several witnesses testified about Tiffany's fear of the petitioner and her concern that he might harm her. According to Heather Vrutnski, Tiffany "appeared frightened, confused. She was scared." Kitty Keller testified that Tiffany was "very frightened. She was pale, shaky. Her voice was quivering." Joseph Bruzas, Tiffany's uncle, testified that "[s]he said, 'You don't understand.' She goes, 'I'm scared.' [and] 'I sleep with a knife under my pillow.'" Tiffany's mother also related Tiffany's fear of the petitioner.

The state alluded to Tiffany's fears in its opening statement. The prosecutor told the jurors that "[t]he evidence will show that Tiffany Skiba was in fear of, was terrified of one person in her short lifetime, and that person is sitting right over there, and that's Richard Frazier, the defendant." He also stated that "[t]he evidence will show, ladies and gentlemen, in November of 1990 that Tiffany was sleeping with a knife under her pillow, that she was in obvious fear of her life."

The prosecutor returned to this theme in closing argument. He referred explicitly to the testimony of Heather and the victim's uncle, Joseph Bruzas. The prosecutor also commented that this "was a well-placed fear," and noted that Tiffany was "terrified" and "suicidal."

Defense counsel objected frequently to evidence and comments about Tiffany's state of mind.

Petitioner argues that this evidence was not relevant, and that its introduction violated his rights under the confrontation clause of the Sixth Amendment. In addition, he argues that admission of this testimony and the prosecutor's comments violated his right to due process of law.

■ To the extent that the petitioner challenges the trial court's ruling on rele-

vance, his claim is not cognizable in this proceeding, absent a showing of a denial of fundamental fairness. Rulings on evidence involve state law, and erroneous rulings on matters of state law cannot lead to habeas corpus relief. *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) ("federal court may not issue the writ on the basis of a perceived error of state law"); *Moore v. Tate,* 882 F.2d 1107, 1109 (6th Cir.1989) ("It is well established that '[w]hile habeas review does not ordinarily extend to state court rulings on the admissibility of evidence ... an erroneous evidentiary ruling which renders a trial fundamentally unfair warrants a writ of habeas corpus.'") (*citing Fuson v.Jago,* 773 F.2d 55, 59 (6th Cir.1985)).

With regard to petitioner's confrontation clause claim, the Supreme Court described the showing he must make to prevail in *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980):

> where a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate indicia of reliability. Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

■ The Ohio Supreme Court relied on the "state of mind" exception to the hearsay rule, as embodied in Ohio R. Evid. 803(3), as a basis for upholding admission of the testimony about Tiffany's fear of the petitioner. *Frazier,* 73 Ohio St.3d at 337, 652 N.E.2d 1000. The state of mind exception to the hearsay rule is "firmly rooted." *Terrovona v. Kincheloe,* 852 F.2d 424, 427 (9th Cir.1988); *United States v.*

*Alfonso,* 66 F.Supp.2d 261, 267 (D.P.R. 1999); *United States v. King,* 1997 WL 666778, *11 n. 6 (S.D.N.Y.), *rev'd on other grounds, United States v. King,* 126 F.3d 394 (2nd Cir.1997).

Other courts have held that evidence of a victim's fear of a habeas corpus petitioner does not violate the confrontation clause. *Barber v. Scully,* 731 F.2d 1073, 1074 (2d Cir.1984) (admission of statement by a friend of the murder victim that on the day of her murder the victim had told the witness that she was afraid of the defendant did not violate confrontation clause); *United States ex rel. Jacques v. Hilton,* 423 F.Supp. 895, 899 (D.N.J.1976) (evidence that victim told witness that he was in fear of defendant and expected to be killed was within scope of state evidentiary rule; habeas confrontation clause claim rejected).

Even if the "state of mind" exception is not a "firmly rooted" hearsay exception, Tiffany's statements had sufficient indicia of reliability to be trustworthy. The petitioner had been seen following her. For two years he had resisted submitting to a blood test. She was substantially younger than the petitioner, and had been the victim of an emotionally traumatizing crime.[1] As a result of that crime, Tiffany had borne the petitioner's child. Tiffany's expressions of fear were repeated and consistent, rather than isolated.

Tiffany's statements about her fears, like those of the victim in *Moore v. Reynolds,* 153 F.3d 1086, 1107 (10th Cir.1998), thus satisfy Sixth Amendment requirements. In that case, as here, more than one witness testified about the victim's statements, which also were otherwise corroborated. The "challenged statements support[ed] each other, and [were] in turn supported by other evidence," so they

could be viewed as trustworthy. *Id.; see also Hopkinson v. Shillinger,* 866 F.2d 1185, 1201, *rev'd on other grounds,* 888 F.2d 1286 (10th Cir.1989) (victim's out-of-court statements, about which five other witnesses testified, that habeas petitioner threatened him and he feared the petitioner, possessed sufficient "indicia of reliability" to satisfy the Confrontation Clause).

Petitioner also claims that admission of testimony about Tiffany's fear of the petitioner violated his right to due process of law because its prejudicial effect so substantially outweighed its probative value as to cause the trial to have been fundamentally unfair. In response to the petitioner's challenge to this evidence, the state appellate court stated that the "evidence that Tiffany expressed fear when appellant made bond, the testimony that she was physically upset when he was seen driving by her home, and the fact that she slept with a knife under her pillow were relevant to prove appellant's identity as the murderer." *State v. Frazier,* 1994 WL 50703, *9 (Ohio App. 8 Dist.).

 I agree with the state court's assessment of the relevance of this evidence. The identity of Tiffany's murderer was the critical issue in the trial. Her expressions of fear were probative because they supported the substantial evidence of petitioner's likely motive. In addition, the testimony that she said she was sleeping with a knife under her pillow pointed to the source of the wound observed after the murder on the petitioner's arm.

Even if the evidence were erroneously admitted, habeas relief would not be appropriate "unless the admission of the evidence rendered the trial 'so fundamentally unfair as to constitute a denial of federal

1. Following Tiffany's murder, but before his trial for that offense, the petitioner was convicted in Medina County on the rape and

related charges that had been pending at the time of Tiffany's death.

rights.'" *Webster v. Rees*, 729 F.2d 1078, 1079–80 (6th Cir.1984) (*citing Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir. 1982)). Federal courts sitting in habeas corpus proceedings are not concerned with state court evidentiary rulings unless such rulings result in a denial of due process. *Id.* I conclude that admission of this evidence did not cause the petitioner's trial to be fundamentally unfair.

The petitioner cites *United States v. Brown*, 490 F.2d 758 (D.C.Cir.1973), to support his challenge to the admission of evidence about Tiffany's fears. That case and its reasoning may well have provided support for a decision not to admit that evidence. But its relevance to the issues in this habeas proceeding is slight, because its holding that evidence of a victim's fear is inadmissible except in limited circumstances is based on evidentiary principles, rather than the constitutional requirements of due process and fundamental fairness. It is, therefore, not authority for finding that introduction of this evidence violated the petitioner's constitutional rights.

**3. Description of Victim's Character**

At several points during closing argument, the prosecutor referred to Tiffany's character and background. These references included a description of Tiffany as "this young, innocent girl," "a loving, caring individual," "that little girl," and "beautiful young lady," who, "in her death [was] a carved-up cadaver." The prosecutor also called on the jurors to remember Tiffany, and how she "was alive [and] had a right to live on the day she died," with the right, "which was taken away by this defendant, to life [and] her youth, [and] her adolescence," "to go to college," "to walk down the aisle," and "to have a family."

Not content with his verbal depiction of the victim, the prosecutor used props to make his point. He placed an empty chair in the middle of the courtroom to "be representative of her." He called on the jurors to "[m]ost importantly, remember this girl right here, symbolically represented in this empty chair." After referring to Tiffany in death "as a carved-up cadaver," the prosecutor showed photographs to the jurors, telling them, "Take a good look. May it live with you the rest of your life."

The Ohio Supreme Court stated that "use of the empty chair was excessive." *Frazier*, 73 Ohio St.3d at 341, 652 N.E.2d 1000. The respondent does not dispute this characterization, which is well-taken. Stunts like this have no place in a fair and professional prosecutor's presentation. To the extent that they aid his cause, they increase the likelihood of reversal.

In determining whether the due process standard has been met, a federal court, under the Anti–Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d), must conclude that the state court's decision is contrary to clearly established federal law. *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1521–23, 146 L.Ed.2d 389 (2000) (O'Connor, J. concurring). This showing is made only "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* at 405, 120 S.Ct. at 1519.

Justice O'Connor's concurring opinion further stated in *Williams* that an "unreasonable application" occurs when "the state court identifies the correct legal principle from this Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412, 120 S.Ct. at 1523. A federal habeas court may not find a state adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S.Ct. at 1522.[2]

■ The Ohio Supreme Court correctly concluded that the prosecutor's gratuitous misconduct did not influence the jury and that his statements were not prejudicial. 73 Ohio St.3d at 341, 652 N.E.2d 1000. The depiction of Tiffany as young, innocent, beautiful, and caring do not appear either to have been inaccurate, based on evidence outside the record, or beyond inferences that fairly could have been drawn from the record. *See Byrne v. Butler*, 845 F.2d 501, 511–12 (5th Cir.1988) (description of victim as decent and hardworking and innocent of wrongdoing based on evidence before the jury and not fundamentally unfair); *Pierson v. O'Leary*, 959 F.2d 1385, 1389–90 (1992) (prejudicial impact from improper, irrelevant testimony about victim's hard-working character and effect of homicide on his family was minimal); *Alley v. Bell*, 101 F.Supp.2d 588, 649 (W.D.Tenn.2000) (testimony about victim's education, desire to join the Marines, and general friendliness and family's last contacts with her and decision not to have an open casket funeral did not have a substantial and injurious effect or influence in determining the jury's verdict where guilt was overwhelmingly shown). Likewise, the description of Tiffany as a "carved up cadaver" was accurate and not fundamentally unfair.

### 4. Misapplication of State Law re. Excusal of Jurors

■ The petitioner claims that the trial judge misapplied the standard of O.R.C. § 2945.25(C) for excusing jurors in a capital case. This claim raises only an issue of state law, which is not cognizable in a federal habeas corpus proceeding. *Estelle v. McGuire*, 502 U.S. 62, 71, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *see also Clemmons. v. Sowders*, 34 F.3d 352, 356 (6th Cir.1994) (grant of excuse for cause, though arguably improper under state law, did not state a federal constitutional violation).

### 5. Excusal of Jurors for Views Against Capital Punishment

Petitioner claims that two jurors, Algirdas Nasvytis and Elisabeth Laskey, were excused improperly for cause on the basis of their views against capital punishment. In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court prescribed the standard for determining when a prospective can be excused for cause based on his or her views about capital punishment. That standard, the court stated, "is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *Id.* at 424, 105 S.Ct. 844.

The trial judge's finding that a juror is impartial is a finding of fact entitled to the presumption of correctness under

**2.** In *Nevers v. Killinger*, 169 F.3d 352, 371 (6th Cir.1999), the Sixth Circuit held that the AEDPA did not vitiate the standard of *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), for determining harmless error. Under that standard, prosecutorial misconduct does not justify habeas corpus relief unless the misconduct had a "substantial and injurious effect or influence in determining the jury's verdict." The Supreme Court's decision in *Williams* appears to abrogate the ruling in *Nevers. Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir.2000).

The result in this case is the same even if the *Brecht* harmless error standard is applicable. As troublesome, improper, unwarranted, and unnecessary as the empty chair was, the petitioner cannot show under *Brecht* that the prosecutorial misconduct was "so egregious so as to render the entire trial fundamentally unfair." 507 U.S. at 637, 113 S.Ct. 1710.

§ 2254(d). *Id.* at 429, 105 S.Ct. 844; *Patton v. Yount,* 467 U.S. 1025, 1028, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Under § 2254(e)(1) the petitioner has the burden of rebutting this presumption by clear and convincing evidence. *Alley v. Bell,* 101 F.Supp.2d 588, 650–51 (W.D.Tenn.2000). Review by this court is limited to determining whether the state court record "fairly supports" the trial judge's finding on this issue. *Rushen v. Spain,* 464 U.S. 114, 120, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). The trial judge need not have issued written findings of fact, provided that the finding is evident from the record. *Witt, supra,* 469 U.S. at 430, 105 S.Ct. 844.

In response to questions from the trial judge, Juror Nasvytis initially stated that he had "no position" on the death penalty. Tr. 234. Then, however, he stated that he would have a problem in voting for the death penalty if the law so required. *Id.* at 235. This was based on his personal belief that he was "not sure—that capital punishment is warranted," and that he would be "more inclined toward life imprisonment with no parole or something . . . ." *Id.* at 235–36.

Mr. Nasvytis also acknowledged that he would have to put his personal feelings aside and follow the law as given to him by the court, even if it conflicted with his personal feelings. *Id.* at 236.

On further questioning by the prosecutor, Mr. Nasvytis stated that he "tend[ed] to lean toward being against the death penalty." *Id.* at 241. He stated that he could listen to the testimony during the guilt phase and, based on that testimony, return a verdict. *Id.* When asked whether he "would be able to sign a piece of paper that authorizes the imposition of death on this defendant," he responded, however, "[i]t would be hard for me to do that." *Id.* at 242). In answer to a question about whether he could "do it," he stated, "Well, then I don't know until I get there . . . it

would be hard for me to do it. I think that I probably would have to do it . . . if I felt there was no doubt in my mind that the individual was guilty of all the crimes . . . ." *Id.* at 242–43. He stated that he "probably" would hold the state to a higher standard of proof than beyond a reasonable doubt because of the death penalty. *Id.*

Mr. Nasvytis said that it was not the case that he would be unable to vote for the death penalty, no matter what the evidence was. *Id.* at 243–44. When asked whether he would be able to "sign a verdict imposing the death penalty," he stated, "I think so." But when then asked whether there was "any doubt in your mind that you could," he responded, "Yes, there is." *Id.* at 244.

When asked by defense counsel whether he thought he could be a fair and impartial juror during the guilt phase, Mr. Nasvytis responded affirmatively. *Id.* at 248. After posing questions, as to a number of which objections were sustained, about the legal aspects of aggravating and mitigating factors, the defense attorney asked Mr. Nasvytis if he could "fairly consider all three options?" To which he responded, "Uh-huh." *Id.* at 249.

The defense attorney later asked Mr. Nasvytis whether he "could follow the law" if it stated that he had to impose the death penalty. To which Mr. Nasvytis responded, "it would be difficult for me to do anyway." *Id.* at 252. After reaffirming his ability to determine guilt or innocence, Mr. Nasvytis, in response to a final question from defense counsel as to whether he "would follow the law and vote to impose the death penalty," stated, "Yes, I would say yeah." *Id.*

Thereafter, after a couple of preliminary comments by the trial judge, the following colloquy ensued:

Judge: I need to know if you can make the commitment to me that you will set

aside your personal feelings and you will follow the law as I give it to you. In other words, if the law requires you to vote for the death penalty, will you commit to me that you will do so even if it violates your personal feelings?

Juror: Well, if it violates my personal—my personal beliefs, my moral beliefs, I couldn't do it, no matter what you said.... I can do everything up to that point.

Judge: If the law requires that you vote for the death penalty, will you, in fact, do so?

Juror: No, not if I don't believe it is right.

Judge: What if the law says that under these circumstances you must vote for the death penalty and you find that those circumstances do exist?

Juror: Whose law?

Judge: Our law.

Juror: Not if I felt that it was morally incorrect, I couldn't do that, no.

Judge: So you cannot commit to me that you will follow the law and impose the death penalty if the law requires you to do so?

Juror: I can't, because I don't feel bound by that more than I do by my own beliefs.

*Id.* at 253–54.

Thereafter, the defense attorney asked, "You are not saying that there are no circumstances where you could vote to impose the death penalty; is that a fair starting point?" In response, Mr. Nasvytis stated, "I have never been put in a situation where I had to be directly responsible for someone's death. So that I—for that reason I don't know what I would—how I would respond if I was in that situation." *Id.* at 254.

After acknowledging that his concerns had to do with his moral principles, *id.* at 254–55, Mr. Nasvytis that "I don't care what the law is, okay, I am going to do

what I think is right." *Id.* at 256. When asked if he could "follow the law and do [the] weighing process," Mr. Nasvytis stated, "certainly my feelings against the death penalty would affect ... how I would weigh those, ...." *Id.* at 257–58. In response to the defense attorney's final question, "So that, in a properly proven case, ... you could follow the law and impose the death penalty," Mr. Nasvytis stated, "Depends—I suppose I could." *Id.* at 258.

After this answer, the trial judge asked, "What does that mean, sir, you suppose you could?" To which Mr. Nasvytis answered, "Well, I think it means depending on—let's say that one of my relatives was the—the individual, the victim, let's say, I would suppose that in that case my—my vacillating would vacillate toward the more serious choice." *Id.*

At sidebar, the trial judge stated that, "This gentleman has indicated that under some circumstances, if a relative were a victim, he would follow the law; in other circumstances, he would not follow the law. He does not believe he is bound by the law." *Id.* at 259–60.

On questioning by the prosecutor, Mrs. Laskey stated that she had "serious reservations about" the death penalty and "reservations that it serves a useful purpose." *Id.* at 386. Asked if she had "serious doubts," she said, "Yeah." *Id.* When asked if she would "be able to pick up the pen, sign your name on that death penalty verdict," she stated, "I really don't know," and "I think I would have so many reservations I may not be able to do it." *Id.* at 387–88.

Mrs. Laskey indicated that her reservations were based on her belief that the death penalty, in effect, was "like saying I am going to murder you to teach you not to murder." *Id.* at 388. Asked if she thought "it is wrong to execute or wrong

to murder, whether the state is doing it or whether someone else is doing it," she replied, "Yes," and acknowledged that she did not want to be a part of it. (*Id.*). When the time came to sign her name on a death verdict, she repeated, she would "probably have really sincere reservations." *Id.*

Mrs. Laskey also indicated, however, that "the law has to be obeyed regardless of my personal feelings." *Id.* at 389. On then being asked, "would you follow the instructions of the law," she responded, "I am still not sure, I guess. Seriously, I am not sure. Maybe I wouldn't. I better not. I better say no, I couldn't follow the law." *Id.* In conclusion, she stated, "I don't think I could take that responsibility. I think my feelings about the death penalty being a deterrent is too deeply engraved. I don't think it is a deterrent. I don't think it solves anything, to kill someone or killing someone." *Id.* at 390. These feelings, she stated, were not religiously based, though she thought "it ethically makes sense." *Id.*

When questioned by defense counsel, Mrs. Laskey stated that she did not have a problem sitting in judgment as to the guilt or innocence of a person charged with a crime. *Id.* at 390–91. She acknowledged that there might be "times I probably would feel" that a crime had been "so heinous I probably would" be able to return a death verdict. *Id.* at 392. Asked later that if "the law says in this circumstance [you] have to follow the law, that you would follow the law," Mrs. Laskey answered, "I can probably follow the law and put my personal bias against the death penalty aside, if I had to make that decision what the law says had to be done." *Id.* at 395–96.

The following colloquy then ensued between the trial judge and Mrs. Laskey:

Judge: ... I need a commitment ... that you will follow the law, even if the law requires you to sign you name to a verdict in which you are voting for the death penalty.

Will you make that commitment to me or can you make that commitment to me?

Juror: No, I don't think I could.

Judge: You cannot?

Juror: I don't think I could.

\*　　\*　　\*　　\*　　\*　　\*

Judge: ... So, what I am telling you is, ma'am, you may be personally against death, but you would have to set aside your personal feelings, and even if you believe in your heart that, no, I really don't want to impose death in this case but the law tells me I have to, I am asking you, will you set aside what your heart tells you and do what the law says? And I need to know if you will make that commitment to me. I know we are not asking you easy questions, but I think you can appreciate we need the answers.

Juror: Yeah, that I need to follow the law instead of a personal feeling regarding -

Judge: What I need to know is can you make that commitment to me?

Juror: No, I don't think I could. I couldn't say I could.

Judge: You cannot say unequivocally you will follow the law even if it is against your personal feelings?

Juror: Probably not.

Judge: If it is against your personal feelings, that's what I should have said.

Juror: No, I probably couldn't.

\*　　\*　　\*　　\*　　\*　　\*

Judge: That's what it really comes down to.

Juror: No, I think probably my feelings against the death penalty would be so strong I couldn't follow the law. I will

not follow the law, would be better, no probably won't follow the law.

*Id.* at 396–98.

When questioned further by the defense attorney, as to whether "it would take a lot to convince you that the aggravating circumstances outweighed beyond a reasonable doubt the mitigating factors," Mrs. Laksey acknowledged that that was "fair." *Id.* at 399–400. In response to the question, "you couldn't say under no circumstance would you follow the law and impose the death penalty; isn't that a fair statement," Mrs. Laskey answered, "Yes." *Id.* at 400. She gave the same answer to the question, "you have said there are circumstances where you could consider it." *Id.* Asked, "can you follow the law and apply the law in this case even if the law said that you had to impose the death penalty," Mrs. Laskey answered, "Yes, I know the law would take precedence over my personal feelings about the death penalty." *Id.* at 402.

Mrs. Laskey again was asked by the court, "are you now making the commitment that you will, in fact follow the law, and if the law requires you to vote for death, you will do so, even if it is against your personal feelings, even if your heart tells you differently." In response, Mrs. Laskey stated, "I think I would have to follow the law until it was changed." *Id.* To this, the court responded, "Ma'am, I need something stronger than I think I might have to. You understand, I need something stronger than I think I might, probably I will. I need a commitment. This is too important. I need a commitment that you will follow the law even if it is totally against your heart." This, in turn, led to the response by Mrs. Laskey, "No I don't think I can give you that commitment." *Id.*

The petitioner claims that the trial judge improperly asked the prospective jurors to make a commitment to follow the law and the court's instructions. Such questions from the court are not improper, as Justice Kennedy noted in his dissenting opinion in *Mu'Min v. Virginia,* 500 U.S. 415, 451, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) (Kennedy, J., dissenting). A trial judge, Justice Kennedy stated, can properly "evaluate impartiality by explaining the trial processes and asking general questions about the juror's commitment to follow the law and the trial court's instructions." Indeed, here, as in *Zuern v. Tate,* 101 F.Supp.2d 948, 988 (S.D.Ohio 2000), "the Petitioner has not cited a single case which would support the proposition that the Eighth Amendment or any other provision of the United States Constitution is violated, when ... such a commitment from potential jurors" has been secured.

Voir dire of each juror was extensive. Both expressed reservations, based strongly held personal beliefs, about their ability to impose capital punishment. Although some portions of the jurors' responses may be viewed as expressing a willingness to follow the law, the totality of their responses provides ample support for the trial judge's decision to excuse them for cause.

■■■ The petitioner has, in any event, failed to overcome the presumption of correctness applicable to the state judge's findings of inability to follow and apply the law. In addition, applying the rigid standard of AEDPA, it is clear that the decision to excuse these jurors was neither "contrary to, [n]or involved an unreasonable application of clearly established federal law" and was not "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d).

### 6. Denial of Defense Challenges to Jurors

The petitioner claims that the trial judge applied different standards when consider-

ing defense challenges to jurors, and improperly denied defense challenges to two of the jurors for cause. The finding that the jurors could disregard their personal beliefs favoring the death penalty and return a verdict consistent with the law is subject to the presumption of correctness. *Patton, supra.*

The first juror whom the petitioner claims should have been excused for cause due to her beliefs regarding capital punishment was Judy Ballard. When asked by the trial judge whether she had a "position for or against the death penalty," Ms. Ballard stated, "For." Tr. 653. After Mrs. Ballard stated that she would vote for the death penalty if the law so required, the trial judge asked her if she would likewise "follow the law that says you cannot vote for death . . . [and] must vote for a lesser penalty." To which she responded, "Yes." *Id.*

Then the trial judge asked her if she could "commit to us that you will set aside your personal feelings regarding the death penalty and simply follow the law, even if it is in conflict with your personal feelings." Ms. Ballard again answered, "Yes," as she did when asked, "You will follow the law?" *Id.*

The prosecutor, after asking if Ms. Ballard could return a death sentence, also asked, "if the law required a different penalty, the penalty or the other option of life imprisonment with the possibility of parole after serving a full 20 or 30 years, if that's what the law required, you would be able to do that, also." *Id.* at 658. Ms. Ballard answered affirmatively. *Id.*

When asked by defense counsel whether "in some cases she might feel it was more appropriate for capital punishment," Ms. Ballard responded, "Most cases, yes." *Id.* at 660. She answered, "Yes," to the question, "if someone has been proven to have killed somebody, do you generally feel that capital punishment should be imposed?"

*Id.* at 660–61. "Would you say," the defense attorney then asked, "that if a person has been proven to have killed somebody, that he should be put to death?" In response, Ms. Ballard stated, "If he has been proved to kill someone, yes." *Id.* at 661. Ms. Ballard also answered, however, "No," when asked, whether she had a "problem" with moving on to "some other penalty" if the "death penalty may not have been proven." *Id.*

Ms. Ballard stated that she could consider, as a possible sentence, thirty years before parole eligibility. But, when asked if she would "have any problem with that," she answered affirmatively. *Id.* at 663. Her problem was that "[t]he person shouldn't be paroled. It should be a life sentence." *Id.* She agreed with the defense attorney's statement, "that because of the possibility of parole that maybe there should be a death penalty," and acknowledged that "that would be on [her] mind." *Id.* She also stated that she did not agree with the possibility of parole after twenty years. *Id.* Asked if it were a fair statement "that if the defendant is found guilty of aggravated murder, that you would impose the death penalty because you don't agree with the 30 years or the 20 years," Ms. Ballard said, "Yes, that's correct." *Id.* at 660–61.

Next the trial judge asked Ms. Ballard, "would you automatically impose the death penalty without consideration of the law?" To which Ms. Ballard responded, "No." *Id.* at 661. When asked what her earlier answers meant, Mrs. Ballard stated that, "anyone who is killing someone shouldn't be out." *Id.*

At this point, the following colloquy occurred:

Judge: What if I were to tell you that our law does not believe that, that that's not how our law is set up? Would you set aside that personal feeling?

Juror: I could. It would be hard, but I could.

Judge: It may very well be hard. But I need to know—and there are no right or wrong answers here, ma'am. I need to know if you will commit to all of us that you will set aside your personal feelings being in favor of the death penalty and if you will follow the law, and if the law tells you that you have to consider certain factors that I will give to you, you will consider those factors. Will you make that commitment to me?

Juror: Yes.

Judge: And will you make the commitment to me that if the State doesn't meet their burden of proof of the aggravating circumstances outweighing the mitigating factors, will you commit to me that you will not vote for death?

Juror: Yes.

Judge: Even though you may not like it, you have to make that commitment to me. If you can't make that commitment to me, you have got to tell me now.

Juror. I could make that commitment.

Judge: Okay. And on the other hand, if the State does meet its burden of proof in the penalty phase, you will vote for death?

Juror: Yes.

Judge: Do you understand my concern here is I think I have heard two different answers from you, and I need to know—I know you are in favor of the death penalty, and I know you believe that if you take a life, your life should be taken. But I cannot stress enough, ma'am, that is not our law.

Will you accept the law or will your personal feelings override what I have told you?

Juror: I will accept the law and put my personal feelings aside.

Judge: You are sure you can do that?

Juror: Yes.

Judge: You are positive?

Juror: Yes.

*Id.* at 664–66.

When asked by the defense attorney if she could put aside her feelings, Ms. Ballard stated that "I have to put aside my feelings." *Id.* at 666. During the course of further questioning of Mrs. Ballard by defense counsel, the court interjected, and asked, "But as you sit here now, do you have an open mind to various possibilities, or, as you sit here now, are you definite that if he is found guilty, I am going to vote for death?" *Id.* at 670. Mrs. Ballard answered, "I don't know. It depends. It might not be the rule... The death penalty might not be the rule." *Id.* at 671.

This, in turn, led to some further questions by the court:

Judge: ... [I]f I tell you you can consider A, B, C, D, E, okay, if I list of things that you can consider, that negate the death penalty, will you consider them?

Juror: Yeah. I have no choice.

Judge: Okay. So you will consider them and determine, according to the law, whether or not you should impose the death penalty or a lesser penalty?

Juror: Yeah.

Judge: Do you have an open mind as you sit here right now?

Juror: Yes.

*Id.* 671–72.

After this series of questions from the trial judge, petitioner's attorney asked that, if she didn't agree with the list of mitigating factors given by the judge, "would you still feel that you should have to give the death penalty?" Mrs. Ballard answered, "No." The defendant attorney's final question was, "You could set aside your own personal feelings and move on to one of these other areas?" To which Mrs. Ballard responded, "Yes." *Id.* 672.

Defense counsel initially passed for cause. He then reversed himself, and objected. The court denied the challenge. *Id.* 673.

The other juror who, according to the petitioner, should have been dismissed for cause was Harold M. Wills. As the outset of his voir dire the court asked, "Do you have a position for or against or no position at all as to the death penalty," to which Mr. Wills responded. "No." *Id.* at 730. But then he said, "No. If he deserves it, give it to him, that's what I say." *Id.* at 731.

After explaining the two distinct phases of the trial and the weighing of the aggravating and mitigating factors, the court asked, "Will you, in fact, follow the law that would require you to vote for death?" *Id.* Mr. Wills answered, "I think I would."

In response to the next couple of questions, Mr. Wills indicated that he was confused. This led to the following exchange:

Judge: Under certain circumstances the law requires you to vote for death. Would you follow that law that would require you to vote for death?

Juror: Oh yeah.

Judge: You would vote for death, if you had to?

Juror: Sure, yeah.

Judge: On the other hand, if other circumstances exist, the law says you may not vote for death, you must consider a lesser penalty of life imprisonment with parole eligibility after 30 years or 20 years. Would you follow the law that says no, you cannot vote for death, you have to vote for lesser penalty?

Juror: I would follow the law.

Judge: So if the law says you can't vote for death, would you follow that law?

Juror: Yes.

Judge: ... [W]ill you put aside all of your personal feelings regarding the death penalty, put them all aside, and just simply follow the law, even if the law is different than your personal feelings?

Juror: I would have to.

*Id.* at 732–33.

When asked by the prosecutor if he could "vote for the imposition of death in this case," Mr. Wills responded, "I think I would." *Id.* at 736. After being told by the prosecutor, "We need something more than that. We need either you can or you can't do that. We need to know now," Mr. Wills repeated, "I think I can do it." *Id.* When asked if he could "sign your name ... [i]f the law says it is an appropriate penalty," Mr. Wills agreed he could do so. *Id.*

Mr. Wills also agreed with the prosecutor, when asked about his initial statement ("If he deserves it, give it to him"), that he meant to express that if the law says death is appropriate, he could follow the law. *Id.* He reconfirmed his ability to set aside his personal feelings and acknowledged his ability to follow the law regarding alternative punishments and impose a lesser sentence. *Id.* at 736–37.

After some initial questions from the defense attorney, Mr. Wills expressed incomprehension about the fact that a person convicted a year and a half earlier of murder of a police officer was still alive. *Id.* at 739. Asked if he thought that person should be put to death for what he did, Mr. Will stated, "Sure I do, sure." *Id.* He agreed with the statement that if someone "kills another person, that he should be put to death." *Id.* at 739–40.

At this point, the following colloquy occurred between defense counsel and Mr. Wills:

Attorney: Now, the law in Ohio says that if the prosecutor proves these aggravating circumstances and that they outweigh mitigating factors that the de-

fense would put on, and they prove this beyond a reasonable doubt, that the jury should return a death penalty verdict. Do you agree with that?

Juror: Sure.

Attorney: Now, the law also provides that there are certain mitigating factors or factors that would lessen against the death penalty to make a lesser penalty.

Can you think of anything in your own mind that would cause you, in relying on these mitigating factors as defined by the law, to change from the death penalty verdict?

Juror: No.

Attorney: So that because of the fact that there was this type of a murder or there was a murder, the taking of somebody else's life, you would feel—or you would vote for the death penalty?

Juror: I sure will.

Attorney: You would not be able to consider any other -

Juror: Huh-uh.

Attorney—mitigating factors?

Juror: No.

Attorney: How much has this to do with [that other] case or is this your own -

Juror: That's my own feeling.

Attorney: This is your own feeling overall?

Juror: All you have to do is look at the state of Michigan, Detroit, Michigan. They don't have a death penalty.

Attorney: And what are you saying about the state of Michigan and the city of Detroit?

Juror: I got a daughter that lives in Michigan. I don't like to go to Michigan.

Attorney: So you are saying that your personal feelings because of your own daughter's situation, the state of Michigan and everything that's going on in Detroit -

Juror: Yeah.

Attorney:—that you would not be able to put these aside -

Juror: No.

Attorney:—and that you would not be able to follow the law with respect to mitigating factors?

Juror: Yeah, I would be able to follow the law.

Attorney: Well, you are saying you can follow the law, but the law is that a juror can consider mitigating factors that would lessen the penalty from death to something else.

Juror: No, I wouldn't. I don't go for that.

Attorney: You could not follow the law in that respect?

Juror: Well, I would have to follow the law.

Attorney: Well, let me go further, sir, and say if you found the defendant guilty of the crime as charged in the indictment, would you keep an open mind in the penalty phase to something less than the death penalty.

Juror: Well, I guess I would. I think I would.

Attorney: You say it very reluctantly, don't you?

Juror: Yeah, yeah.

Attorney: Sir, I need a commitment from you that you would keep an open mind in the penalty phase and that you would be able to consider something other than death if I told you that that is what the law required you to do. Would you be able to?

Juror: Yeah. Oh sure, yeah.

Attorney: Are you sure?

Juror: Sure.

Attorney: So, if you found the defendant guilty, you wouldn't automatically vote for death, would you, or would you?

Juror: No, I wouldn't automatically vote for death. But if—if the law required him to die, I would say, yeah, kill him. Attorney: But what if the law said to you that you have to consider all these other factors, that's in opposition to imposing death, would you be able to consider all of the other factors? Juror: Sure. Attorney: You would?

And would you be able to return a verdict less than death? Juror: Such as life imprisonment? Attorney: Yes. Juror: Yeah. Attorney: You would be able to? Juror: Sure. Attorney: No doubt in your mind? Juror: That's right.

*Id.* at 740–44.

Thereafter, the defense attorney asked, "you wouldn't be able to put aside your personal feelings and beliefs and consider something that would take away the death penalty in something like this?" Mr. Wills responded, "Sure, I could.... I wouldn't have to give him the death penalty.... I could vote for life imprisonment. I could do that." *Id.* at 745. Asked if he "will be able to consider reasons that could lessen the death penalty," Mr. Wills replied, "Yeah." *Id.* at 746.

When asked specifically if he could consider the something less than the death penalty in a case involving a charge of purposeful killing of a witness who was the defendant's stepdaughter, Mr. Wills repeated, "Yeah, I could consider it." *Id.*

The court denied the defense motion to excuse for cause. The judge noted that Mr. Wills had given "two different answers, one to the State and a different one

to [the defense]," and that she had "tried to make my questions as neutral as possible to see if he could make the commitment or not. He said yes.... I have to go based on the answers." *Id.* at 747.

The Supreme Court of Ohio succinctly and accurately responded to the petitioner's contention that the trial judge applied different standards to the state's and defense's challenges for cause:

The trial judge did not apply different standards in ruling upon defense challenges for cause than it did for the state's challenges. The distinction is that Laskey and Nasvytis both stated that they could not put aside their personal feelings and would not be able to follow the law. Ballard and Wills stated that they would be able to put aside their personal feelings and they would apply the law as instructed by the trial judge.

73 Ohio St.3d at 329–30, 652 N.E.2d 1000.

This conclusion is amply supported by the record. As to both jurors challenged unsuccessfully by the petitioner, the trial judge had an ample basis for concluding that their personal beliefs supportive of the death penalty could be set aside. This is the same standard followed by the trial court when it considered the defense challenge to the other jurors.[3]

▮ The petitioner's conclusory assertions do not overcome the presumption of correctness applicable to the state judge's findings that the challenged jurors could follow and apply the law. The decision to overrule the challenge to these jurors was, in any event, neither "contrary to, [n]or involved an unreasonable application of clearly established federal law" and was

---

**3.** Petitioner did not inform the trial judge that, in his view, she was applying differing standards to her assessment of the ability of different jurors to set their personal beliefs to

one side. His present claim could, accordingly, have been deemed waived had the state chosen to assert waiver in response to petitioner's direct appeal on this issue.

not "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d).

### 7. Prosecutorial Misconduct During Sentencing Phase

The petitioner claims that the prosecutor's closing argument during the sentencing phase improperly inflamed the passions of the jury when he displayed Tiffany's bloody clothing, referred to the petitioner as a rapist, and commented on facts not in evidence, the heinousness of the crime, and the petitioner's unsworn statement to the jury. Objections were sustained to many of these statements.

#### a. Bloody Clothing

The prosecutor referred to Tiffany's bloody clothing at various points in the state's sentencing phase argument. In his opening statement, he had referred to the pans of the scales of justice; as he began his closing argument, he said, "Here is sits in the right pan ..., Tiffany Skiba, with her blood soaked clothes, soaked as she lay there, dying with each of these stab wounds in her and each of these torture wounds in her." Tr. 2767. Objections to these references were overruled.

 The clothing properly was admitted to show the manner and means of the assault and ensuing death. *See Todd v. Stegall,* 2000 WL 654960 (E.D.Mich. 2000) (comment that victim's clothing, as shown in a photograph, was consistent with being shot at close range, not improper); *see also United States v. Bamberger,* 456 F.2d 1119, 1127 n. 5 (3rd Cir.1972) (" 'Pistols, fruits of the crime, clothing, parts of the body of the person killed, everything pertaining to the crime which will aid the jury in its consideration of the (alleged) crime and the guilt or innocence of the accused, is admissible'. This has been the law for centuries.") (citation omitted). *See generally* Anno, "Admissibility, in Homicide Prosecution, of Deceased's Clothing Worn at Time of Killing," 68 A.L.R.2d 903, § 2[a] (1959) ("In homicide prosecutions, the general rule is that the clothing worn by the victim at the time of the killing is admissible in evidence, even where its introduction may be prejudicial to the accused, if it tends to shed light upon a material inquiry in the case."). A prosecutor properly may refer to admitted evidence in closing argument, and that is what occurred with regard to the references to the bloody clothing.

 Later, the prosecutor stated that Tiffany "is not here. We have bloody clothing to represent her." Tr. 2801. The court overruled an objection by the defense. This statement is an appeal to the jury's sympathies, and approaches, if it does not cross over, the boundary line of fair argument. It did not, however, deprive the petitioner of a fundamentally fair trial.

After the jury had been charged, the defense made the following statement and objection: "We would like the record to reflect that a small chair was placed in front of the jury when the prosecutor was arguing about Tiffany Skiba and that her bloody shirt was draped over that and that they put that evidence on that chair in front of the jury during their argument." Tr. 2825. The trial court overruled the objection on the basis that the objection was untimely. The court of appeals sustained the ruling on the basis of procedural default. 1994 WL 50703 at *11. This issue, accordingly, cannot be considered on its merits.

If it could be so considered, the petitioner would not be entitled to relief. As discussed in subsection 3, *supra,* the prosecutor's use of these props was unprofessional, improper, and excessive, and raised the potential for reversal. Even when coupled with the prosecutor's reference to Tiffany's bloody clothing as representing her, this gratuitous and unjustified appeal

to the jurors' sympathies did not deprive the petitioner of a fundamentally fair trial.

**b. Reference to Petitioner as a Rapist**

As he was describing the crime, and after referring to the petitioner's anger, the prosecutor asked, "Who else would rape a 15–year–old girl?" The court sustained an objection to this rhetorical question. Tr. 2782. Later the prosecutor stated that Tiffany "was his victim. Richard Frazier's victim, the rapist, the murderer." The petitioner's objection to this statement was sustained. Tr. 2802.

 Because the objection was sustained, the jury must be presumed to have disregarded these statements. *Greer v. Miller,* 483 U.S. 756, 767 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions"); *United States v. Ford,* 872 F.2d 1231, 1239 (6th Cir.1989) (same). This presumption has not been overcome.

**c. Reference to Matters Outside the Record**

During closing argument the prosecutor referenced several matters outside the record. He said, "We know there is no evidence of her having any other enemies anywhere." Tr. 2771. An objection was sustained. At a later point the prosecutor stated: "I never had the privilege of meeting her, but I feel that I know her well"; "I had a chance to meet her family, and they are all beautiful people"; "There is a tendency . . . [to] go from one case to the next case. That's not the case with Tiffany Skiba." Objections to each of these comments were sustained. Tr. 2802–03. The presumption that the jury would disregard these comments has not been overcome.

**d. Reference to Heinousness**

 The prosecutor stated at one point in his closing argument, "there are some crimes that are so heinous they do not deserve to be rewarded." Tr. 2796. There was no objection to that statement, which was isolated and generic. Use of that term did not deprive the petitioner of a fundamentally fair trial.

**e. Comment on Petitioner's Silence**

As he began his closing argument, the prosecutor stated that the petitioner "hasn't shown the slightest bit of remorse, which would be some mitigation, some regret, some explanation, some sorrow, some acknowledgment of wrongdoing, which he was given the opportunity of the 14th of November, explain it. Why, why. And he cannot do it. He will not do it." Tr. 2767. Without an accompanying limiting or cautionary instruction, the trial court sustained an objection. Later the prosecutor said, "He has no alibi, no alibi witnesses." Again an objection was sustained. Tr. 2795.

There is no reason to believe that the jurors did not abide by the court's sustaining of the objection and disregard these statements.

In any event, the references to the failure of the petitioner to acknowledge his "wrongdoing" and "explain it" on November 14th and his lack of an alibi and alibi witnesses were not improper. Under the Supreme Court's decision in *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (per curiam), a suspect who elects to discuss a particular subject with police after receiving Miranda warnings may be questioned about inconsistencies between that discussion and his later trial testimony. This rule applies where, as here, the defendant does not testify, but his version of events is placed before the

jury. *United States v. Hoac,* 990 F.2d 1099, 1104 (9th Cir.1993).

■ Here the defendant asserted his innocence in his unsworn statement to the jury. That assertion was inconsistent with the petitioner's statements to the investigators who met with him in the Medina County jail. It was, therefore, permissible for the prosecutor to call attention to the petitioner's failure to "explain" his "wrongdoing" at that time and to provide an alibi and alibi witnesses.

Later, using the image of the scales of justice, the prosecutor stated, "against what's in this pan. Nothing is in this pan. Nothing has been brought in to weigh it down. Nothing has been put in here to bring it down and force the weight of Tiffany Skiba and the three locomotives on her lap up. Nothing has brought that up." Tr. 2797. Two objections during this statement were overruled.

■ There was no violation of the rule of *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), which prohibits comment about a defendant's exercise of the right not to testify. These statements were not "manifestly intended" as a comment on the petitioner's exercise of his right not to testify during the guilt phase. Thus, no *Griffin* violation occurred. *See United States v. Bond,* 22 F.3d 662, 669 (6th Cir.1994); *Bagby v. Sowders,* 894 F.2d 792, 797–98 (6th Cir. 1990).

There is, in any event, disagreement as to whether comment after a defendant has testified at sentencing about his failure to do so during the guilt phase violates *Griffin.* Compare *Lesko v. Lehman,* 925 F.2d 1527, 1541–43 (3d Cir.1991) ("[A] capital defendant does not completely waive his *Griffin* rights by testifying at the penalty phase solely on mitigating factors that are wholly collateral to the merits of the charges against him.") *with Tucker v. Francis,* 723 F.2d 1504., 1511–12 (11th Cir.

1984) ("It is not fundamentally unfair to comment on the appellant's silence during the culpability phase as juxtaposed with his exculpatory testimony during the sentencing phase.").

Thus, allowing the jurors to consider these statements was not contrary to, or did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

Finally, the prosecutor stated, with regard to the petitioner's unsworn statement to the jury, that the prosecution had had forty-five witnesses who had taken the oath to tell the truth, but the petitioner "testified without taking an oath," so that "I couldn't cross-examine him. And you decide the value of his statement." Tr. 2800. Objections were overruled.

■ The court of appeals held that the prosecutor's statements went beyond the zone of permissive comment on a capital defendant's electing to address the jury in an unsworn statement. 1994 WL 50703 at *11. That court also concluded, however, that the "prosecutor's statements referring to appellant's unsworn statement for the most part conformed to the limitations" under Ohio law, so that the "comment about [the] inability to cross-examine was not prejudicial to appellant's right to a fair trial." *Id.* I agree that the prosecutor's comment on the unsworn quality of the statement and his inability to cross-examine the petitioner following the statement did not deprive the petitioner of his right to a fair trial.

Taken as a whole, even in light of those areas of the closing argument that were excessive or improper, the closing argument did not result in fundamental unfairness to the petitioner. The petitioner is not entitled to relief on this claim.

### 8. Lack of Notice re. Charge

The petitioner claims that his right to due process was violated when the indictment, which charged him with a separate count of aggravated burglary, failed to identify the felony that he allegedly intended to commit on entering the occupied structure.

The state courts held on direct appeal that this claim had been waived for failure to have raised it prior to trial, as required by Ohio R.Crim. P. 12(B)(2). *Frazier, supra,* 73 Ohio St.3d at 332, 652 N.E.2d 1000. The petitioner not having shown cause for and prejudice from the waiver, cannot obtain habeas relief on this claim.

In any event, this claim is without merit. The due process clause requires only fair notice of the charges. *In re Ruffalo,* 390 U.S. 544, 550, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); *Watson v. Jago,* 558 F.2d 330, 338–39 (6th Cir.1977). Such notice was given in this case. Read in the context of the other charges, it was clear that the murder of Tiffany was the felony connected to the burglary charge. The indictment suggested no other felony, and the state undertook to prove no other felony at trial.

Even if a reading of the burglary charge in the context of the other charges in the indictment failed to apprise the petitioner of the nature of the underlying felony, the burglary charge nonetheless met due process requirements. *See West v. Johnson,* 92 F.3d 1385, 1396 n. 15 (5th Cir.1996) (where indictment, alleging merely "burglary of a habitation" satisfied requirements of state law, habeas relief not warranted)

In his traverse, the petitioner claims that the intermediate appellate court failed to explain its reasons for rejecting this claim. According to the petitioner, such failure impairs this court's opportunity to review that court's ruling.

The Ohio Supreme Court explained its reasons for its rejection of this claim. That explanation provides an ample basis for this court's review of the claim. There is no merit to petitioner's conclusory assertion that the Supreme Court's explanation does not overcome the omission in the intermediate court's opinion.

In any event, the state court decision overruling this claim was neither contrary to nor an unreasonable application of Supreme Court precedent. The petitioner is not entitled to relief on this claim.

### 9. Failure to Merge Offenses

Petitioner claims the trial court was required to merge the aggravated burglary specification with the aggravated murder specification. The aggravated burglary, he argues, was incidental to the aggravated murder, and merged into the aggravated murder charge.

Rejecting this claim on petitioner's direct appeal, the Ohio Supreme Court stated:

> In *State v. Moss* (1982), 69 Ohio St.2d 515, 23 O.O.3d 447, 433 N.E.2d 181, paragraph two of the syllabus, this court held, "Aggravated murder, as defined by R.C. 2903.01(B), is not an 'allied offense of similar import' to aggravated burglary, as defined by R.C. 2911.11(A)(1), for purposes of application of R.C. 2941.25(A)."

The elements of aggravated burglary and aggravated murder do not correspond to such a degree that the commission of one results in the commission of the other. "[I]n order to commit either the crime of aggravated burglary or aggravated murder, the other crime need not be committed.... 'The two offenses are not prerequisites, one for the other. To consummate either offense, the other need not by definition be committed. Aggravated murder and aggravated burglary are never merely incidental to

each other ...'" *State v. Henderson* (1988), 39 Ohio St.3d 24, 28, 528 N.E.2d 1237, 1242.

As the crimes of aggravated burglary and aggravated murder are not allied offenses of similar import, appellant's arguments are without merit.

73 Ohio St.3d at 342–43, 652 N.E.2d 1000.

■ State courts, as the Supreme Court stated in *Mullaney v. Wilbur*, 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), "are the ultimate expositors of state law." Thus, "a state decision resting on an adequate foundation of state substantive law is immune from review in federal courts." *Wainwright v. Sykes*, 433 U.S. 72, 81, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Consequently, the Ohio Supreme Court's determination that the charge of burglary was properly made and proven forecloses a different result in this proceeding.

Petitioner argues that failure to have merged the aggravated burglary and aggravated murder charges prevented the jury from properly weighing the aggravating and mitigating circumstances at sentencing. In addition he contends that the death sentence would have been disproportionate and excessive had merger occurred.

In *West, supra,* a habeas petitioner similarly argued that his death sentence was not valid because it was based on a conviction for murder and burglary where the felony associated with the burglary had been the murder alone, rather than a separate theft or similar offense. Rejecting the claim, the court noted:

The Texas Court of Criminal Appeals has several times upheld capital murder convictions on the basis of a burglary where the burglary was established by the murder of the victim following unlawful entry into his or her habitation. The evidence here is plainly sufficient to show burglary by [petitioner's] forced entry into the victim's room followed by his murder of her therein.

92 F.3d at 1397–98 (citations and footnote omitted).

Here the Ohio Supreme Court held as a matter of law that the burglary charge was sufficient, and no proof other than the murder was needed to convict the petitioner of the burglary. Ohio's similar interpretation of its law on this issue is as binding on this court as the Texas court's interpretation of that state's law was on the federal court in *West.*

### 10. Ohio R. Evid. 410

The petitioner, expressly waiving his right to have his lawyer present, contacted Cleveland Police Detective Svekric on November 14, 1991. This led to a meetings between the petitioner, Detective Svekric, Cleveland Police Lieutenant James, and Assistant Cuyahoga County Prosecutor McGinty, who later conducted the prosecution against the petitioner.

The circumstances of the meetings and statements by the petitioner during those meetings were summarized by the Ohio Supreme Court in its opinion on petitioner's direct appeal:

On November 14, 1991, appellant requested a meeting with Detective Svekric. Originally, Svekric told appellant he could not meet with him for a few days. After this discussion, Svekric notified Lieutenant James and Prosecutor McGinty of the conversation. Svekric was advised that he should go to the jail as appellant requested. The three men went out to the Medina County Sheriff's office to speak with appellant. Svekric and James met with appellant and read him his Miranda rights, which appellant voluntarily waived. Appellant insisted that he understood that he had the right to have an attorney present during the interview.

Svekric and James informed appellant that they were not interested in the Medina (rape) case, that they were only interested in the murder of his former stepdaughter. Appellant informed the detectives he had information about other murders involving the Hell's Angels. The detectives once again informed appellant that their sole purpose for being there was to discuss the Skiba murder with him. Appellant requested that the conversation be "off the record." The detectives informed him that this was not possible, that anything he said could be used against him in court. Appellant was asked a series of ten questions concerning Skiba. Appellant was then asked additional questions concerning the last day he worked that month and about the rental of a Honda automobile. Appellant responded that he had a reason for renting the car but that he was not going to say what at that time.

\* \* \* \* \* \*

Detectives then asked if appellant had an alibi for 5:05 a.m. on November 8, 1990. Appellant responded that he did not have an alibi for that time.

Appellant then began to question what the detectives could do for him. He stated that he did not want to go to trial in Cleveland and asked if they could get him "a flat time" if he pled guilty. The detectives informed appellant that the only thing they could do would be to talk with the prosecutor's office and the judge and explain whether or not he had cooperated with the police, but they were not in a position to make any decisions as to what he could plead or what the punishment would be.

Appellant then offered to plead guilty to murder or manslaughter and the impending rape charge if he could make a deal. The detectives repeated their previous statement that they had no authority to make a deal. Appellant requested that the detectives bring the Cuyahoga County assistant prosecutor back with them, at which time he would tell everything he knew about the murder of his former stepdaughter. The detectives had appellant taken back to his cell while they conferred with McGinty.

The three men returned to the Medina County Sheriff's office. Appellant was brought from his cell and again read his Miranda rights, which he waived. When asked if he wanted to have an attorney present, appellant responded, "No." The detectives explained that he was entitled to have an attorney present and appellant responded that he did not want his attorneys to know that he was talking to the police.

The detectives informed appellant that the case against him was going to be presented to the grand jury and that he would more than likely be indicted for aggravated murder. Appellant again stated that he did not want to go to trial in Cleveland and again offered to plead to a lesser charge in the rape and murder if he could "work a deal for straight time."

At this time, James was called from the office. When he returned, he informed appellant that they knew of the medical clinic where he had his wrist sutured the morning of the murder. Appellant became reticent, although he continued to express an interest in entering into a plea bargain. The detectives remained firm in their statements that the most they could do was to talk to the prosecutor's office and the judge who would be assigned to the case and inform them that he had cooperated.

Svekric then asked, "Do you want to tell us exactly what happened on November 8th with Tiffany Skiba, yes or no?" Appellant responded that he would tell them what they wanted to

know, but requested that his attorneys be present. At this time, questioning ceased and appellant's attorneys were contacted.

73 Ohio St.3d at 334–36, 652 N.E.2d 1000.

The petitioner claims that his statements during these meetings constituted plea discussions, and thus were inadmissible under Ohio R. Evid. 410. According to the petitioner, the state courts applied an amended version of the rule to allow his statements to be admitted. By doing so, he asserts, the state court violated the ban on ex post facto laws.

There is no merit to the petitioner's contention because the premise on which it is based—that his statements occurred in the context of plea negotiations—is invalid. The Ohio Supreme Court held on direct appeal that "regardless of which version of Evid. R. 410...applied," the November 14th interview "was simply not a plea discussion." 73 Ohio St.3d at 336, 652 N.E.2d 1000.

■■■ Whether the statements were made in the context of plea discussions was a finding of historical fact, and thus is binding on this court. *See Phillips v. Murphy,* 796 F.2d 1303, 1306 (1986) ("the State Court's finding that there were no plea negotiations is clearly one of historical fact subject to the § 2254(d) presumption.").

It is, therefore, immaterial which version of Rule 410 may have applicable when the petitioner's statements were admitted, because neither version was relevant to the admissibility of the statements.

In any event, even if the evidence came within one or the other versions of Rule 410, the state court's ruling an admissibility is not cognizable in this proceeding. *Estelle v. McGuire, supra.*

### 11. Ex Parte Contact by the Prosecutor With a Represented Defendant

The petitioner claims that Assistant Prosecutor McGinty violated Disciplinary Rule 7–104(A)(1) of Ohio's Code of Professional Responsibility when he met ex parte with the petitioner in the absence of petitioner's counsel. That provision states:

During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

■■■ The Ohio Supreme Court, noting that the petitioner had "distinctly waived" his right to counsel, 73 Ohio St.3d at 342, 652 N.E.2d 1000, held that McGinty had not violated DR 7–104(A)(1). This interpretation of state law, which is binding on this court, precludes habeas relief. *Wainwright v. Sykes, supra.*

■■■ Petitioner, citing cases involving federal prosecutions, claims that McGinty's ex parte contact violated the Fifth and Sixth Amendment. It does not appear that he sought relief on this basis in the state courts. In both the intermediate appellate court, 1994 WL 50703, * 8–9, or the Ohio Supreme Court, 73 Ohio St.3d at 342, 652 N.E.2d 1000, petitioner's presentation of this claim was based entirely on the Ohio Code of Professional Responsibility. He has, accordingly, waived any constitutional basis for his claim, absent a showing of cause and prejudice. *Wainwright,* 433 U.S. at 86, 97 S.Ct. 2497.

■■■ Even if the petitioner has not waived this challenge by not having presented it to the state courts, his claim is without merit because it has no constitutional basis. The principal case on which he relies, *United States v. Hammad,* 858 F.2d 834, 841 (2nd Cir.1988),[4] expressly

---

**4.** Petitioner cites *United States v. Hammad,*

846 F.2d 854 (2d Cir.1988), in support of his

enunciated a non-constitutional doctrine based on a federal court's inherent supervisory powers over federal prosecutions. Decisions based on the supervisory power are not relevant in a habeas corpus proceeding. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ("not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'") (*citing Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)); *DeLisle v. Rivers*, 161 F.3d 370, 388 (6th Cir. 1998) ("We have no [supervisory] power...'to intervene to protect the integrity of the [state court] system'") (*citing Frazier v. Heebe*, 482 U.S. 641, 647 n. 7, 107 S.Ct. 2607, 96 L.Ed.2d 557 (1987)).

### 12. Admission of Photographic Evidence

At petitioner's trial the court admitted two sets of photographs. One set consisted of twelve photos of Tiffany's body at the crime scene. The coroner took the other set of fourteen photos during the autopsy. The petitioner contends that introduction of the autopsy photographs was excessive, repetitive, and cumulative, and their quantity and gruesome character deprived him of his rights to a fundamentally fair trial and an impartial jury.[5]

The Ohio Supreme Court held that the photographs "were not repetitive or cumulative...[and] were introduced during the coroner's testimony to illustrate the testimony." 73 Ohio St.3d at 333, 652 N.E.2d 1000. The court pointed out that "[e]ach photograph present[ed] a different perspective of the victim...[and] were used to illustrate the twenty-one stab wounds and other cuts, many of which were defensive in nature."

To prevail on his claim that admission of the autopsy photos violated his federal constitutional rights, the petitioner must show that the state court's evidentiary ruling "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). As stated by the Sixth Circuit in *Lundy v. Campbell*, 888 F.2d 467, 473 (6th Cir.1989), "[t]he ultimate question is whether the claimed error was so egregious as to have nullified the legitimacy of the properly admitted substantive evidence." *Accord, Jamison v. Collins*, 100 F.Supp.2d 647, 702 (S.D.Ohio 2000).

In *Mason v. Mitchell*, 95 F.Supp.2d 744, 778 (N.D.Ohio 2000), the court, upholding admission of eight crime scene and autopsy photographs over a habeas corpus petitioner's due process objection, stated:

The trial court has discretion to admit a relevant photograph unless it is so gruesome or inflammatory that its prejudicial impact substantially outweighs its probative value. The eight 3–1/4 × 5″ photographs challenged by Petitioner in this case were relevant not only to show how the victim died, but also to corroborate the testimony of the law enforcement personnel who testified, to illustrate the officers's testimony which described the crime scene and the location and condition of the victim's body, to show the nature and extent of the injuries to the victim, and to assist the jury in understanding the testimony of the medical examiner. These are all le-

---

claim. That initial version of the court's opinion was superseded by the court's revised opinion in *United States v. Hammad*, 858 F.2d 834 (2nd Cir.1988).

5. Though not originally submitted as part of the record, the respondent has provided the photographs pursuant to court order.

gitimate purposes for which victim photographs are routinely admitted. The trial court did not abuse its discretion by admitting the crime scene and autopsy photographs.

In *Woods v. Johnson*, 75 F.3d 1017, 1039 (5th Cir.1996), the court, likewise overruling a due process challenge to eight crime scene photos, stated:

The photographs were introduced during the testimony of the police officers who discovered the body and arrested [the petitioner] at the apartment. In addition to identifying the deceased, the photographs served to illustrate and make more understandable the officers' testimony which described the apartment and its condition, and the location and condition of the deceased's body and the nature and extent of the injuries to the deceased. These are certainly legitimate purposes. [The petitioner] does not contend that any of the photographs were unrepresentative or misleading respecting either the condition of the victim or the crime scene. Moreover, he in essence does not dispute that introduction of three or "even" four such photographs would have been permissible, but contends that eight was, in effect, overkill. However, as the district court observed, each of the photographs, with the sole exception of numbers 3 and 4, shows injuries and details that the others do not. It is entirely clear that photographic evidence of the kind introduced was entirely proper, and that to the extent more was used than appropriate this did not go so far as to render Woods' trial fundamentally unfair.

 In this case, the petitioner's principal argument is that admission of a total of twenty-five photographs of the victim was unfairly and prejudicially cumulative. Admission of so many photos did not, however, necessarily deprive the petitioner of a fundamentally fair trial. As stated in *Gonzalez v. DeTella*, 127 F.3d 619, 621 (7th Cir.1997):

admission of "gruesome" photos of the decedent in a murder case does not justify collateral relief, even when the evidence is cumulative and likely designed more to inflame the jury than to supply an essential underpinning of the prosecution's case.

Photographs of the decedent's body are relevant. They tend to show that the crime charged by the indictment took place. Graphic depictions of multiple bullet wounds also may be relevant: they can (and here did) support the prosecution's other evidence about how the crime occurred....Although these facts were adduced in a more sedate fashion through the testimony of a pathologist, no rule of law, and certainly no rule of constitutional law, limits the prosecutor to one piece of evidence in support of each element of the offense. This is so even when the element is uncontested—indeed, even when the defendant offers to admit the element....

The investigators' testimony about the crime scene photos accompanied their testimony about the conditions in Tiffany's bedroom, including evidence of her efforts to resist her assailant. That evidence, in turn, was relevant to testimony about the petitioner's physical appearance shortly after the murder, treatment of his wound, and his dubious explanation about how he was injured. Admission of the coroner's photos also illustrated his testimony that no single wound was fatal.

The properly admitted evidence pointed clearly to the petitioner as Tiffany's killer. That evidence included extensive proof of petitioner's motive, the persuasive circumstantial evidence of the bootprint, his bruised physical appearance shortly after the murder, evidence of Tiffany's attempts to defend herself, the implausibility of peti-

tioner's account of the wound to his wrist, and indicia of guilt contained in his statements to the officers in the Medina County jail.

Though permissible under a due process standard, introduction of twenty-five photographs of Tiffany's butchered body nonetheless manifested the prosecutors' pervasive instinct for inappropriate excess observable elsewhere in the the conduct of this case—most noticeably in their initial opening and final closing arguments. That inappropriate and unprofessional excess does not, however, nullify "the legitimacy of the properly admitted substantive evidence." *Lundy*, 888 F.2d at 473; *see also Garrett v. Parke*, 1989 WL 153553, *1, 892 F.2d 79 (6th Cir.1989) (Unpublished Disposition) (admission of thirty-three or thirty-four photos of victim and victim's bloody clothes did not cause trial to be fundamentally unfair).

### 13. Jury Instructions re. Foreseeability

Petitioner claims that the trial court improperly used a negligence standard to describe foreseeability in its instructions.

The challenged instruction stated:

Cause is an act which in the normal and continuous sequence of events produces the death and without which the death would not have occurred, when the death is the natural and foreseeable result of the act.

A death is the result of an act which it [sic] is produced directly the act in a natural and continuous sequence and would not have occurred without the act. Result occurs when the death is naturally and foreseeably caused by the act. The causal responsibility of the defendant for an unlawful act is not limited to its immediate or most obvious result. He is responsible for the natural, logical and foreseeable results that follow in the ordinary course of events from an unlawful act.

The test[ ] for foreseeability is not whether the defendant should have foreseen the injury in its precise form. The test is whether a reasonably prudent person, in the light of all the circumstances, would have anticipated the death was likely to result to anyone from the performance of the unlawful act.

The Ohio Supreme Court noted that this instruction had been criticized by the intermediate appellate court that affirmed the petitioner's conviction. 73 Ohio St.3d at 331, 652 N.E.2d 1000. The Supreme Court also noted, however, that the instruction had been held not to have allowed the jury to find a defendant guilty on the basis of simple negligence where the jury otherwise was informed that it had to determine that the defendant acted with intent to kill. *Id.*

In this case, the trial court expressly gave that directive to the jury. Elsewhere in its instructions, the court told the jury:

As previously stated, before you can find the defendant guilty of aggravated murder in the first count, you must find beyond a reasonable doubt that Tiffany Skiba's death was purposely and with specific intent caused by the defendant in accordance with these instructions of law herein given while the defendant was committing or attempting to commit or while fleeing immediately after committing or attempting to commit aggravated burglary.

Moreover, as pointed out by the Ohio Supreme Court:

The trial judge elaborated on the instructions and provided a thorough explanation of causation both before and after the OJI portion of the instructions. The trial judge included the instruction that purpose can be inferred from the use of a deadly weapon. Additionally,..., the state also made it clear in

closing arguments that in order to return a verdict of guilty, the jury had to determine that appellant acted with the intent to kill.

73 Ohio St.3d at 331, 652 N.E.2d 1000.

■■■ The fact that an instruction is improper under state law is not a basis for habeas relief. *Estelle v. McGuire,* 502 U.S. 62, 71, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Instead, the Supreme Court stated in *Estelle:*

> The only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction such as the one at issue here, we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly."

502 U.S. at 72–73, 112 S.Ct. 475 (citations and footnote omitted).

■■■ The state courts concluded that the challenged instruction was not improper. In any event, even if that portion of the instruction had been erroneous, it is clear that the overall charge imposed the obligation to find that the defendant specifically intended to kill Tiffany.

### 14. Reasonable Doubt Instruction

The petitioner claims that the court's instruction on reasonable doubt allowed him to be convicted on the basis of proof that did not meet that standard. The instruction, taken from O.R.C. § 2901.05(D), stated:

> Reasonable doubt is present when you, the jurors, after you have carefully considered and compared all the evidence, cannot say that you are firmly convinced of the truth of the charge. It is doubt based on reason and common sense. Reasonable doubt is not mere doubt, because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt.
>
> Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

The Sixth Circuit upheld Ohio's reasonable doubt charge in *Thomas v. Arn,* 704 F.2d 865 (6th Cir.1982). "When read as a whole," the court stated, "Ohio's statutory definitions of reasonable doubt, . . . , do not offend due process or any other federally guaranteed constitutional right." *Id.* at 869. *Accord, Scott v. Mitchell,* 209 F.3d 854, 884 (6th Cir.2000).

### 15. Sufficiency of the Evidence

The petitioner claims the evidence was insufficient to sustain his conviction under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In assessing this claim, all reasonable inferences must be drawn in favor of the state and conflicting inferences must be presumed to have been resolved in the state's favor. *Id.* at 326, 99 S.Ct. 2781.

From a reading of the trial record, I conclude that the Ohio Supreme Court accurately summarized the evidence against the petitioner:

> Appellant had a powerful motive to kill Skiba. Skiba had accused appellant of sexually abusing and raping her. Appellant was the putative father of Skiba's two-year-old son. Appellant's rape trial and paternity blood test were scheduled to occur within days of the murder.

Skiba played a role in the divorce between appellant and Susan Bednarski. Appellant sent Skiba a Halloween card requesting that she contact him, and he was seen on a number of occasions in and around her neighborhood and following her school bus.

Appellant was linked to the scene by bootprints in the neighbor's garden. He was aware of the family's daily routine and the layout of the house. The method of entry was identical to that used by his former brother-in-law when they were locked out of the house.

Appellant's behavior immediately before and after the murder was unusual. Although he owned at least two operable vehicles, he rented a car two days before the murder. He received medical attention for a cut on his wrist on the morning of the murder. The attending physician testified that the cut was consistent with a stab wound. Appellant requested the help of friends in moving his car and in retrieving items from his apartment. He did not return to his apartment the weekend following the murder.

The evidence suggests that the murderer knew the family's schedule, was familiar with the layout of the house, including uniquely located light switches, knew how and where to enter the home, knew where to find the victim, acted quickly to avoid detection, and did not steal or otherwise disturb anything else in the home as would be common for a burglarer. Additionally, appellant's statements to the police and his offer to plead guilty to Skiba's murder and rape in return for a definite term sentence further support an inference of appellant's guilt.

*Id.* at 340, 99 S.Ct. 2781.

The petitioner claims that this evidence was insufficient to sustain a conviction in light of the fact that the bootprint could have been made by any one of 40,000 pairs of boots with that characteristic feature. In addition, he points out that the wound in his arm was consistent with his explanation that he had injured himself while working on his vehicle on the day of the murder. He also argues that his conviction was tainted by the admission of improper evidence, without which, he asserts, a conviction could not have been obtained.

■■■ As discussed elsewhere, the evidence petitioner challenges was admissible. The jury rejected his contention about how he was wounded. The jury's conclusion that the petitioner's boot left the print cannot be disregarded by this court, which must, as noted, draw all inferences favorable to the state. Petitioner's motive and his opportunity to commit the crime are indisputable. In sum, there was sufficient evidence to persuade a rational trier of fact of petitioner's guilt beyond a reasonable doubt.

### 16. Constitutionality of Ohio's Death Penalty Scheme

Petitioner claims that Ohio's death penalty scheme violates the Sixth, Eighth, and Fourteenth Amendments. His recitation is, as the respondent notes, "somewhat difficult to dissect into discrete claims of unconstitutionality." Several arguments may, however, be discerned, and will be discussed in the sequence in which they are presented in the petition.

#### a. Least Restrictive Punishment

■■■ Petitioner claims that capital punishment is unconstitutional because it is not the least restrictive means of achieving its purposes. Restraint, the petitioner asserts, can accomplish the objectives of deterrence and incapacitation. There is, however, no constitutional requirement that the legislature select the least severe penalty possible, as the Supreme Court made clear in *Gregg v. Georgia,* 428 U.S. 153, 175, 96 S.Ct. 2909, 49 L.Ed.2d 859

(1976) ("We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved.").

In any event, the Court found studies concerning the deterrent effect of capital punishment to be inconclusive, *id.* at 185, 96 S.Ct. 2909, and thus an insufficient basis on which to disregard a legislative determination that capital punishment is an appropriate sanction. *Id.* at 186, 96 S.Ct. 2909.

### b. Excessive Prosecutorial Discretion

The petitioner claims that excessive discretion is given to prosecutors to determine when to seek the death penalty. The Supreme Court rejected this argument in *Gregg:*

> Petitioner simply asserts that since prosecutors have the power not to charge capital felonies they will exercise that power in a standardless fashion. This is untenable. Absent facts to the contrary it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts.

*Id.* at 225, 96 S.Ct. 2909 (White, J.). *Accord, Zuern v. Tate,* 101 F.Supp.2d 948, 1002 (S.D.Ohio 2000).

### c. Determination of Guilt and Punishment by the Same Trier of Fact

The petitioner claims that allowing the same jury to determine guilt and punishment violated his right to effective assistance of counsel and a fair trial before an impartial jury.

With regard to his right to counsel claim, the petitioner asserts that, having presented an unsuccessful defense at the guilt phase, he and his attorney were unable to present themselves as credible during the penalty phase. His right to effective assistance of counsel was also impaired, according to the petitioner, by the need to conduct voir dire on the subject of the death penalty, thereby suggesting in advance of trial that his case was so weak that his primary concern was with the possibility of death. Finally, the petitioner asserts that his inability to control the distribution of the results of any pretrial mental examination to which he might be entitled has an incapacitating effect on his lawyer's ability to represent him effectively.

Petitioner argues that he was deprived of his right to an impartial jury when the same jurors adjudicated his sentence after having determined his guilt. In effect, he contends, the jury's ability impartially to determine sentence was irredeemably foreclosed by its participation in, deliberations during, and verdict following the guilt phase.

 There is no support in the case law for the petitioner's contention that either his right to counsel or to a fair trial is denied when the same jury hears both the guilt and penalty phases of the trial. Although the Supreme Court has not considered the specific challenges asserted by the petitioner, it has consistently approved the use of the same jury to determine both guilt and punishment. *See generally Lockhart v. McCree,* 476 U.S. 162, 180, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *see also Romano v. Oklahoma,* 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (assuming the validity of such proceeding); *Buchanan v. Kentucky,* 483 U.S. 402, 417, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987) ("The Court further explained in *McCree* that the State's interest in having a single jury decide all the issues in a capital trial was proper."). Absent support more persuasive than the petitioner's conclusory arguments about the prejudice resulting from

having the same jury determine issues of guilt and sentence, he has not shown that this procedure rendered the sentencing proceeding and its outcome fundamentally unfair.

The petitioner also complains about compelled disclosure to the prosecutor and jury of the results of any mental examination. This procedure has been held not to violate constitutional norms. *Byrd v. Collins,* 209 F.3d 486, 539 (6th Cir.2000); *Scott v. Anderson,* 58 F.Supp.2d 767, 797 (N.D.Ohio 1998), *rev'd in part, aff'd. in part on other grounds sub nom. Scott v. Mitchell,* 209 F.3d 854 (6th Cir.2000) ("because the defendant is given an option of requesting a pre-sentence report, and can choose to develop background information on his own, there appears nothing constitutionally infirm about the state providing the option, even if it carries with it some attendant risks or requires some level of strategic choice.")

■■■ The rationale underlying the Supreme Court's decision in *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), is applicable here. In that case, the Court held that the right to a fair trial was not violated when the state conditioned the defendant's right to obtain discovery on disclosure by him of information concerning any alibi that he might offer.

■■■ The disclosure required by O.R.C. § 2929.03(D)(1) is similar. The statute provides that a defendant in a capital case may alone request a mental examination for use at the sentencing phase. If he does so, the report shall be considered by the jury. As in *Williams,* 399 U.S. at 82, 90 S.Ct. 1893, this procedure enhances the search for truth and does not render the proceedings fundamentally unfair. *See also United States v. Lee,* 90 F.Supp.2d 1324 (D.N.M.2000) (due process, self-incrimination, and confrontation rights not violated by reciprocal disclosure require-

ments of Classified Information Procedures Act). Nor, in my view, is the right to effective assistance of counsel thereby impaired. The risk that the examination will produce unfavorable results is simply one factor that counsel must take into consideration in determining how to approach the sentencing phase.

### d. Use of the Term "Outweigh" re. Aggravating and Mitigating Factors

Petitioner claims that the language of Ohio's death penalty provision, that "the aggravating circumstances . . . outweigh the mitigating factors," diminishes the standard of proof at sentencing. This argument disregards the trial court's express instruction that the standard of proof was beyond a reasonable doubt.

The trial judge charged the jury that "the State of Ohio has the burden of proving by proof beyond a reasonable doubt that the aggravating circumstances that the defendant was found guilty of committing are sufficient to outweigh any factors in mitigation of the imposition of the sentence of death." According to the petitioner's interpretation, use of the term "outweigh" introduced the risk that the jurors might find only by a preponderance of the evidence that aggravating circumstances were greater than mitigating circumstances.

Other challenges to this language have been rejected. *See Scott v. Mitchell,* 209 F.3d 854, 876 (6th Cir.2000) ("instruction pertains only to the weighing process, and not to the existence of individual mitigating or aggravating factors."); *Cooks v. Ward,* 165 F.3d 1283, 1291 (10th Cir.1998) (this language does not mandate imposition of death penalty); *Davis v. Executive Director of Dept. of Corrections,* 100 F.3d 750, 776 (10th Cir.1996) (instruction did

not render petitioner's trial fundamentally unfair).

■ The court's instruction made clear that whether aggravating circumstances outweighed mitigating factors had to be determined by proof beyond a reasonable doubt. There was no error in this instruction. In any event, as with his complaints about other jury instructions, the petitioner has failed to show how his right to a fundamentally fair trial was denied by the challenged instruction, as underscored by the duty to make that finding on the basis of the reasonable doubt standard.

### e. Inducement to Plead Guilty

The petitioner claims that defendants indicted on capital charges are unconstitutionally induced to plead guilty. Improper coercive pressure arises, according to the petitioner, from the fact that an indicted defendant is aware that, if he proceeds to trial, his sentence will be determined by jurors who will discount his credibility, having already found him guilt of murder. This risk is enhanced, he asserts, due to the death qualification of the jurors.

This claim, though not referencing Ohio R.Crim. P. 11(C)(3), appears to derive from that provision. Rule 11(C)(3) permits the trial judge, if a defendant offers a plea of guilty, to dismiss the death penalty specifications "in the interest of justice."

In support of his claim, the petitioner cites *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). In that case the Supreme Court held that a capital sentencing scheme "needlessly penalize[d]" the right to plead not guilty when to do so would eliminate all risk of a death sentence. *Id* at 582, 88 S.Ct. 1209.

■ The procedural structure in this case differs from that at issue in *Jackson*. Here, there is no guarantee that a guilty plea will avoid all risk of a death sentence. Thus, the desire to eliminate that risk entirely, which the Supreme Court held

could penalize the right to proceed to trial, is not present here. Ohio, accordingly, imposes no burden on the exercise of the right to trial by jury. *Dennis v. Mitchell*, 68 F.Supp.2d 863, 903 (N.D.Ohio 1999).

To the extent that the petitioner contends that he was entitled to be sentenced before a separate jury than that which found him guilty, his claim fails for want of legal support. Juries in some states, *see Sam v. State*, 523 P.2d 1146 (Okla.1974) (assault and battery); *Robinson v. State*, 705 S.W.2d 293 (Tex.App.—San Antonio 1986) (burglary), participate in both the guilt and sentencing phases in non-capital cases. Petitioner has not cited any case standing for the proposition that such participation violates the federal Constitution. To the extent that authority exists, it supports the constitutionality of sentencing by the same jury following a guilty verdict. *See Thomas v. Taylor*, 170 F.3d 466, 470 (4th Cir.1999) (no constitutional violation where juvenile tried as an adult was sentenced to death by the guilt-phase jury) (dictum).

### f. Insufficient Data to Conduct Proportionality Review

The petitioner contends that insufficient data about the reasons for life sentences is gathered in capital cases which result in a sentence other than death. Without such data, the petitioner contends, Ohio's reviewing courts cannot conduct an adequate proportionality review.

■ This claims fails because the federal Constitution does not require a proportionality review. *See, e.g., Pulley v. Harris*, 465 U.S. 37, 43–44, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Coe v. Bell*, 161 F.3d 320, 351–52 (6th Cir.1998) (statute providing for proportionality review did not create a liberty interest). Thus, Ohio can choose to implement whatever procedures it desires with regard to such review.

To the extent that the petitioner is contending the state and its courts have not complied with Ohio law, such claim is not cognizable in this proceeding. *See Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

The Ohio Supreme Court stated, "After conducting a proportionality review and comparing appellant's case with similar cases, we determine that the penalty imposed is neither excessive nor disproportionate." *Frazier*, 73 Ohio St.3d at 345, 652 N.E.2d 1000. As noted in *Roach v. Angelone*, 176 F.3d 210, 217 (4th Cir.1999). a federal court cannot " 'look behind' the review conducted by the [sate] Supreme Court...and endeavor to ascertain what that court 'really did'...[because] this would be a virtually impossible task and the Constitution does not require...such a speculative undertaking."

### g. Preclusion of Mercy

The petitioner claims that the Ohio death penalty scheme precludes mercy as an option, either in the absence of mitigation or when aggravating circumstances outweigh mitigating factors. In making this argument, he points neither to a statutory provision nor judicial decision that forecloses mercy on the jury's part. There being no legal basis for his argument, it is without merit.

 In essence, the petitioner appears to be complaining that Ohio law does not require an instruction to the jurors that, if they elect, and despite the evidence to the contrary, they can be merciful and impose a life sentence on that basis alone. No court, even in a capital context, is required to invite jury nullification. Thus, in his concurring opinion in *Jurek v. Texas*, 428 U.S. 262, 279, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), Justice White noted that the Texas capital statute "does not extend to juries discretionary power to dispense mercy, and it should not be assumed that juries will disobey or nullify their instruc-

tions." *See also Sumner v. Shuman*, 483 U.S. 66, 85 n. 13, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987) ("guided-discretion statutes..., provide for bifurcated trials in capital cases to avoid nullification problems."); *Lockhart v. McCree*, 476 U.S. 162, 172, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) ("so-called 'nullifiers,' or individuals who, because of their deep-seated opposition to the death penalty, would be unable to decide a capital defendant's guilt or innocence fairly and impartially...may properly be excluded from the guilt-phase jury"); *Mapes v. Coyle*, 171 F.3d 408, 416 (6th Cir.1999) ("there is no merit whatsoever to [the] claimed entitlement to a 'merciful discretion' instruction, in light of the likely tendency of such an instruction to lead to arbitrary differences in whom is selected to be sentenced to death.").

### h. No Requirement That Trial Court Find Death to be the Only Appropriate Penalty

The petitioner claims that the trial judge is not required to make an express finding that the death penalty, if imposed, is appropriate. He points out that Ohio appellate courts must, under O.R.C. § 2929.05, determine that death is the only appropriate penalty.

Because the trial judge need not make a finding that the penalty is appropriate in the particular case, the petitioner argues, reviewing courts must speculate about whether the trial judge dealt with this constitutionally mandated issue.

The petitioner's argument ignores the fact that under Ohio law the trial judge independently determines whether to accept the jury's death verdict. When the trial court does so, it implicitly determines that death, rather than a life sentence, is appropriate in the particular case. Thus, though Ohio law may not expressly direct the trial judge to make a specific finding

about the suitability of a death sentence, its procedures compel such determination on the judge's part.

■ State court adjudication of this claim, moreover, did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

### i. Failure to Require Premeditation, Etc.

Section 2929.02(D) of the Ohio Revised Code requires a finding that the defendant be "found specifically to have intended to cause the death of another." The petitioner claims that the failure of the Ohio legislature to define "specific intent" in this provision or elsewhere improperly exposes persons who act without premeditation and deliberation, or prior calculation and design, to the death penalty.

■ The flaw in the petitioner's argument is in its premise: namely, that premeditation and deliberation or prior calculation and design are prerequisites to a valid death sentence. This is not so, as the Supreme Court pointed out in *Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) ("major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the...culpability requirement.").

### j. Standard of Proof

The petitioner claims that the standard of proof should be "beyond all doubt," rather than the conventional "beyond a reasonable doubt." This claim has been rejected in this district. *Morales v. Coyle*, 98 F.Supp.2d 849, 883 (N.D.Ohio 2000).

■ The state court's rejection of the claim, moreover, did not result in a decision that was contrary to, or involved an unreasonable application of, clearly estab-

lished federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

### k. Adequacy of Aggravating Circumstance

The petitioner claims that the same factor that results in guilt—felony murder—was also the aggravating circumstance that resulted in his death sentence. As pointed out by the Sixth Circuit in *Scott v. Mitchell*, 209 F.3d 854, 884–85 (6th Cir.2000), this claim is without merit in light of the Supreme Court's decision in *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988):

> Even if...the same act was the basis of [the] conviction and aggravating circumstance, this alone would not justify habeas relief. [In] *Lowenfield v. Phelps*, 484 U.S. 231, 244–46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988)[,]...the Supreme Court instructed that aggravating circumstances are not ends unto themselves, but simply one means by which a state may perform the narrowing function. *See id.* at 244, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568. *Lowenfield* upheld the Texas death-penalty scheme, in which the narrowing function was performed by the legislature when it circumscribed the range of offenses eligible for the death penalty. *See id.* at 245–46, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568. "The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." *Id.* at 246, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568. Similarly, the Ohio Legislature "narrow[ed] the class of felony murders subject to the death penalty by

excluding those who commit [murder in the course of an] arson, robbery, burglary or escape, unless they are charged with a different aggravating circumstance." *State v. Buell,* 22 Ohio St.3d 124, 489 N.E.2d 795, 807 (1986); *see also* Ohio Rev.Code § 2929.04(A) (1996) ("Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment...and proved beyond a reasonable doubt:"). [The petitioner] fell within the narrowed category of death-eligible felony murderers because he committed or attempted to commit aggravated robbery. See Ohio Rev. Code § 2929.04(A)(7) (1996).

### l. Differential Treatment of Felony Murder and Premeditated Murder

The petitioner claims that the Ohio death penalty scheme treats felony murders more harshly than premeditated murders, and thus is unconstitutional. The basis for this argument appears to be the fact that felony murder is an aggravating circumstance, while premeditation is not such a circumstance.

To the extent that this claim is simply a reformulation of petitioner's earlier claim that his sentence is unconstitutional because the aggravating circumstance was also an element of the crime of felony murder, it is without merit for the reasons stated in the foregoing subsection.

If the petitioner is complaining that treatment of felony murder and persons convicted of that offense fails to narrow the class of homicides that can result in a death sentence, I disagree. Section 2929.04(A)(7) of the Ohio Revised Code limits capital felony murder to killings occurring during the commission of aggravated burglary, aggravated robbery, and aggravated arson, with the defendant being shown either to have been a principal

in those offenses or having committed the murder by prior calculation and design.

 Petitioner presents this claim without analysis, argument, or citation to authority. There is no merit to this claim, the adjudication of which did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

### m. Failure to Require State to Prove Absence of Mitigation

 The petitioner asserts in a single sentence that Ohio's death penalty statute unconstitutionally relieves the state of the obligation of proving an absence of mitigating factors. Because the state constitutionally can impose the burden of proof on the defendant to prove mitigation, *Walton v. Arizona,* 497 U.S. 639, 650, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the state properly can be relieved of any obligation to prove the absence of mitigating factors.

### n. Vagueness of the Statutory Scheme

Likewise, the petitioner asserts in a single sentence that Ohio's statutory scheme is impermissibly vague. To the extent that this complaint is directed at the felony murder aspect of the statute, it is without merit. *Dennis v. Mitchell,* 68 F.Supp.2d 863, 903 (N.D.Ohio 1999).

Otherwise, the petitioner has failed to show that the adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

### o. Ensuring Proper Weighing and Consideration of Aggravating and Mitigating Circumstances

The petitioner claims that Ohio's death penalty statutes have impermissibly deva-

lued the importance of mitigation because no method exists to ensure that proper "weighing and consideration" is accomplished. Petitioner's contention is not supported by citation to case law or other authority, and is unaccompanied by analysis. He has, accordingly, failed to show that the adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

**p. Instruction Not to be Affected by Sympathy or Mercy**

The trial court charged the jurors during the guilt phase that they "must not permit sympathy or bias, prejudice or favoritism for either side to affect your judgments." Tr. 2678. No similar charge was given prior to the sentencing phase. The anti-sympathy charge is an entirely proper charge, and one which benefits the defendant.

Neither charge referred to mercy. Thus, petitioner's claim that the jury was instructed that not to let "mercy enter into its determination" has no factual basis in the record. In any event, even if the jurors had been so charged, his claim is without merit for the reasons expressed in subsection g, *supra.*

**17. Cumulative Error**

Petitioner claims that his conviction and sentence are invalid due to cumulative error. Having found no substantial error in the proceedings in the state courts, there can be no cumulative error of sufficient magnitude to entitle the petitioner to habeas corpus relief.

**18. Failure of State Appellate Court to Articulate Reasons for Finding Aggravating Circumstances Outweighed Mitigating Circumstances**

The petitioner contends that the intermediate appellate court failed to comply with the mandate of O.R.C. § 2929.05(A), which requires independent review of death sentences. The Ohio Supreme Court has interpreted this requirement as imposing on the reviewing courts a duty to "articulate the reasons why the aggravating circumstances outweigh the mitigating factors." *State v. Maurer,* 15 Ohio St.3d 239, 473 N.E.2d 768 (1984) (Syllabus ¶ 4).

■ The petitioner claims that the intermediate appellate court simply expressed itself in conclusory fashion, without giving its reasons as required by Ohio law. The Ohio Supreme Court held, however, that the intermediate court had complied with § 2929.05(A) in the text of its opinion, and that, therefore, the statutory command had been satisfied. *Frazier,* 73 Ohio St.3d at 343, 652 N.E.2d 1000. This determination of state law is binding on this court. *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1989).

Even if the court of appeals erred, and failed to comply with the statutory command, such failure was not prejudicial. The Ohio Supreme Court undertook its own independent review and weighing of the aggravating and mitigating factors, and concluded that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt.

**19. Ineffectiveness of Counsel: Mitigation Phase**

The only evidence offered in mitigation was a two sentence unsworn statement by the petitioner to the jury. According to the petitioner, his trial counsel provided ineffective assistance of counsel by not calling a retained mitigation specialist as a mitigation witness or using any of the information she had obtained on his behalf.

■ To obtain relief, petitioner must show both that his counsel's performance "fell below an objective standard of reasonableness" and that he was prejudiced as a result. *Strickland v. Washing-*

ton, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel are presumed to have been competent, and the petitioner has the burden of overcoming this presumption. *United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *United States v. Fortson,* 194 F.3d 730, 736 (6th Cir.1999). In applying *Strickland,* "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689, 104 S.Ct. 2052.

As the Sixth Circuit noted in *McQueen v. Scroggy,* 99 F.3d 1302, 1313 (6th Cir. 1996), "[i]n certain circumstances, failing to call appropriate mitigation witnesses can amount to ineffective assistance of counsel. Specifically, this is true where the [mitigation] witnesses had evidence to offer and where it was not a reasonable tactical decision to refuse to call them." Certainly, as the court also noted in *McQueen,* the claim that "failure to call...family witnesses was ineffective assistance of counsel has an intuitive appeal,...." *Id.* But, as the court's opinion in *McQueen* also makes clear, the an informed decision not to call family members to testify about a defendant's childhood and upbringing can in some instances be sensible and appropriate. *Id.* at 1314; *see also Mason v. Mitchell,* 95 F.Supp.2d 744, 777 (N.D.Ohio 2000) (risk of adverse impact from introduction of mitigation evidence and resultant cross-examination outweighed potential benefits).

Petitioner states that information about his background, childhood, and mental status was available and should have been introduced in mitigation. This information related to petitioner's: 1) abandonment by his parents shortly after his birth; 2) having been reared by his sister until being forced from her home in his early teens; 3) living subsequently with his mother, who had abandoned him years before; and

4) suffering a head injury that adversely affected his ability to control his behavior.

The petitioner, aside from alluding in a conclusory fashion to the existence of potentially mitigating evidence, has presented no evidence in this or any other proceeding to support his contentions about the mitigating influence of any possible evidence about his family history and background. Nor does he assert that his lawyers failed to investigate possible sources of mitigation evidence, or, that if they did so, they erroneously elected to forego using it.

██ Petitioner had the burden of developing the record in state court. *Mitchell v. Rees,* 114 F.3d 571, 578 (6th Cir.1997). Neither there nor here has the petitioner undertaken to present evidence as to, *inter alia:* 1) what evidence was available and would have been admissible on those subjects; 2) efforts by him or others to call such evidence to his lawyers' attention (or, in the alternative, that his lawyers were unaware of such evidence due to an inadequate investigation or other inappropriate inattentiveness to petitioner's case); or 3) the constitutional unsoundness of a decision on his lawyers' part, to the extent they were aware of such evidence, not to use such evidence.

██ Petitioner has, accordingly, failed to meet his burden of showing that, with regard to evidence about his family history and background, that his lawyers provided constitutionally inadequate representation. There is no basis in any of the records before this court for concluding that the performance of petitioner's counsel was constitutionally defective with regard to the failure to introduce evidence concerning the petitioner's family background and circumstances. Likewise, the petitioner has not shown how he was prejudiced by the absence of such evidence.

In response to petitioner's claim of ineffective assistance of counsel with regard to

his contention that he had suffered a "disabling head injury ... that affected his ability to properly control his behavior," the court of appeals found:

> From the record, it can reasonably be concluded trial counsel were appraised of the purported brain injury from their review of medical records; however, as a matter of trial strategy counsel deemed this avenue of defense unworthy of further pursuit. This conclusion is reinforced by three factors: 1) counsel's argument to the trial court that a psychologist would be used merely to interpret the mitigation expert's findings; 2) counsel's filing of the motion requesting a limitation on references to mitigation factors to only those upon which appellant ultimately relied; and 3) the thorough and professional manner in which counsel conducted appellant's defense during both the guilt and the penalty phase of appellant's trial.

*State v. Frazier,* 1997 WL 764810, *6 (Ohio App. 8 Dist.).

Appellate court factual findings are binding on this court. *Sumner v. Mata,* 449 U.S. 539, 545–46, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Thus, the findings that petitioner's trial counsel were appraised of his purported brain injury, *see Doyle v. Dugger,* 922 F.2d 646, 650–51 (11th Cir.1991) (finding that counsel sought advice of medical experts binding on federal court), and deemed that "avenue of defense unworthy of further pursuit" are binding on this court. *Berryman v. Morton,* 100 F.3d 1089, 1095 (3rd Cir. 1996) (finding re. strategy binding); *Haley v. Armontrout,* 924 F.2d 735, 740 (8th Cir. 1991) (finding that counsel made a strategic decision not to call witnesses binding).

It is apparent, therefore, that petitioner's trial counsel chose not to develop the record further with regard to the effect of his head injury, and that they did so as a matter of trial strategy. Petitioner has not shown that this strategic decision was deficient, or that it caused him prejudice.[6]

---

**6.** Petitioner has undertaken to supplement the record with a report showing that he has "occasional difficulties in controlling and regulating his behavior,...these difficulties are the result of [a] head injury...[and] his behavior in a moment of stress might become distracted, poorly regulated, and out of his conscious control, in part because of the cognitive deficits he sustained as a result of a head injury and in part because he is person who tends to deny and repress his feeling....(Doc. 68, Exh. 2 at 5)." Other reports submitted in this proceeding state that the petitioner has "functional brain impairment" due to a head injury (*id.* Exh. 3 at 11) that may have resulted in compromised judgment and impaired impulse control (*id.* at 15–16) and "a diminution of self-control [which]...may manifest itself as an increase in irritability, selfishness, restlessness and lack of concern for others." (*Id.* Exh. 4 at 6).

Notwithstanding these opinions, which the petitioner claims should have been presented to the jury in mitigation during the sentencing phase, he is not entitled to relief. They are essentially speculative, and insufficiently favorable to justify a finding that his

lawyers acted incompetently when they declined to seek out and offer evidence about a 1987 head injury and its alleged impairment of his ability to control his impulses.

I note, moreover, that the evidence of record, in addition to enabling the jury to find the petitioner guilty beyond a reasonable doubt, shows that he acted with deliberation and forethought in that he rented a car shortly before the crime (and returned it shortly afterwards), entered the victim's house at a time when he would have known that the victim's grandparents were absent, gained entry by a means made known to him by her grandfather, and he committed the crime following refusal by the United States Supreme Court to hear his challenge to the order that he submit to paternity tests to determine the father of the victim's child.. These acts do not manifest impulsive or uncontrolled behavior.

Finally, the petitioner has not shown that he was unable to have developed the record during state post-conviction relief proceedings. Moreover, his defense attorney waived the right to an independent mental examina-

### 20. Failure to Appoint Additional Psychological Expert

The petitioner claims that he was denied due process of law, a fair trial and his right to the effective assistance of counsel[7] when the state trial court refused his request to provide funds for a psychological expert during the investigation phase of his case. The court's reason for doing so was that it had already provided funds for a mitigation expert. Tr. Vol II at 8–10.

The petitioner did not appeal this ruling on direct appeal. When he raised this claim in his post-conviction relief petition, the trial court ruled that consideration of the claim was foreclosed under the doctrine of res judicata. (Exh. P at 3–4). The state appellate court, affirming that decision, stated, "the trial court's failure to grant appellant's motion for a psychological expert in mitigation is an issue which could...have been raised on direct appeal [and] the trial court properly applied the doctrine of res judicata." 1997 WL 764810, *5.

 This ruling constitutes a finding of procedural default, which bars consideration of this claim in this proceeding. *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994) (failure to comply with Ohio requirements re. direct appeal constitutes procedural default). Consequently, the petitioner is required to show cause for and prejudice from his failure to have complied with Ohio's procedural requirements. *Wainwright*, 433 U.S. at 90–91, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Morales v. Coyle*, 98 F.Supp.2d 849, 865 (N.D.Ohio

2000) ("the res judicata rule is an adequate and independent State ground upon which the State can foreclose federal habeas review of the defaulted federal constitutional claims.").

The petitioner has not undertaken to explain or justify his failure to have included this claim in his direct appeal. Consideration of the claim in this proceeding is, accordingly, foreclosed under the *Wainwright* doctrine.

In any event, I conclude that no error of a constitutional dimension occurred when the trial judge refused to grant the petitioner's request for additional expert services.

Under O.R.C. § 2929.02.4 the trial court, in a capital case involving an indigent defendant, "shall authorize the defendant's counsel to obtain the necessary services" that are "reasonably necessary for the proper representation" of the defendant, and "shall order... payment of the fees and expenses for the necessary services." Pursuant to this provision, the trial court provided funds with which defense counsel employed Patricia Snyder, a "mitigation expert."

Thereafter, petitioner's counsel sought approval to obtain the services of a psychologist to provide an independent psychological examination. Defense counsel expressly declined to avail themselves of the services of the Court Psychiatric Clinic. Instead, counsel insisted that they were entitled to "the services of [a psychological] expert who can and will be in the

---

tion tr. 2737 Doc. 24 at 85. In sum, the record justifies the conclusion that his lawyers acted deliberately and competently when they decided not to offer evidence of his head injury and its putative effects on his self-control.

The respondent has objected to consideration of these reports. While I agree that they properly should not be a part of the record in this proceeding, I have, in the inter-

est of providing the petitioner with the fullest possible review, considered them as part of my determination of the merits of the petitioner's claim.

7. Petitioner also asserts a denial of his right to counsel on this basis in Count 24 of his petition. His right to counsel claim is discussed in subsection 24, *infra*.

position of being an *advocate* in defending him against the indictment returned against him." (Exh. P, Bates # 643).

The trial court refused to grant this request. Tr. Vol. II, at 8–10. Expressing her concern with the additional cost that would be incurred, the trial judge also stated, as an "aside," her concern that granting the request would "undermine" O.R.C. § 2929.03(D)(1). *Id.* at 9.

That statute provides that a court in a capital proceeding:

> upon the request of the defendant, shall require a mental examination to be made, . . . .
>
> * * * * * *
>
> Copies of any reports prepared under this division shall be furnished to the court, to the trial jury if the offender was tried by a jury, to the prosecutor, and to the offender of his counsel for use under this division.

Prior to commencement of the punishment phase, the petitioner's attorneys waived the right to a mental examination under this statute. Tr. Vol. XIV at 2737.

It is apparent from the record that the trial court correctly apprehended that petitioner's counsel were trying to avoid having to share with the prosecutor the results of any mental examination of the petitioner. He could have had an examination conducted at the Court Psychiatric Clinic, but was concerned that such examination would not be independent. Alternatively, he could have had a pre-sentencing examination conducted pursuant to § 2929.03(D)(1), but would have had to share copies of the examination with the prosecutor and jury. Instead of accepting these conditions, he sought funds to obtain an examination from a psychological expert of his own choosing, the results of which would not have to be disclosed.[8]

 Petitioner claims that denial of his request for an independent and confidential examination deprived him of due process and fundamental fairness at the mitigation stage of his trial. That claim is premised on the implicit contention that he was entitled, as a matter of constitutional law, to have the state pay for a psychologist of his choosing. That premise, as the Sixth Circuit recently has made clear in *United States v. Osoba*, 213 F.3d 913 (6th Cir.2000), is incorrect. In that federal prosecution the defendant had sought funds to employ a psychiatrist of his choosing to conduct a mental examination. He wanted to use the results in mitigation at sentencing to show he had a reduced mental capacity and thus qualified for a downward departure under the Federal Sentencing Guidelines.

The court in *Osoba* initially held that the defendant had made an insufficient showing of need under the applicable statute, 18 U.S.C. § 3006A(e)(1),[9] to justify the expenditure of funds for a mental examination. *Id.* at 915–16.

To the extent, however, that petitioner implicitly is contending that he was entitled to his choice of a psychologist, the court's opinion in *Osoba* answers that contention as well:

> Under this Circuit's precedent interpreting *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the constitution only requires the government to furnish an indigent criminal defendant psychiatric or psychological assistance during the sentencing phase of

---

**8.** As discussed in subsection *24, infra,* the petitioner's right to counsel was not impaired by the requirement of O.R.C. § 2929.03(D)(1) that the results of an examination under that provision must be provided to the prosecutor.

**9.** Section 3006(A)(1) is substantially similar to O.R.C. § 2929.02 .4, in that it, like the Ohio provision, authorizes payment for services that the trial court finds are necessary.

a trial if 1) the defendant's sanity was a significant issue during the trial, or 2) defendant is on trial for his life and the state first presents psychiatric evidence of future dangerousness. See *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1120 (6th Cir.1990) (en banc). Due process does not mandate that [the defendant] be given psychological assistance in this case because his sanity is not primarily at issue and he has not been convicted of a capital offense.

*Id.* at 917; *see also Smith v. Anderson*, 104 F.Supp.2d 773, 811 (S.D.Ohio 2000) (failure to obtain independent psychologist did not constitute ineffective assistance of counsel where defendant, a drug user, only "sought to show that his mental capacity was diminished through drug and alcohol use, and that this allegedly deprived him of the specific intent necessary to convict him of intentional murder.").

### 21. Ineffective Assistance of Counsel re. Pretrial Publicity

The petitioner contends that his trial counsel failed adequately to support a motion for a change of venue. This claim was not asserted on direct appeal and, as a result, the trial court held that it was foreclosed by the doctrine of res judicata from consideration on its merits on post-conviction review. (Exh. P at 3–4).

 Thereafter, the petitioner did not appeal that finding on appeal of the denial of his post-conviction petition. *See* Exh. S. He has, accordingly, waived this claim. *Murray v. Carrier*, 477 U.S. 478, 489–90, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (cause and prejudice standard of *Wainwright, supra*, applicable to failure to appeal).

 In any event, on a review of the record, including the exhibits attached to the petitioner's motion for post-conviction

relief, I conclude that the trial court's refusal to change venue was well-founded. Thus, even if the petitioner's claim of ineffective assistance of counsel with regard to that motion could be considered on its merits, despite his defaults, it would not be well taken. Where the decision not to change venue was proper, counsel's handling of the change of venue motion cannot be found to have been ineffective. *See Breeding v. United States*, 840 F.2d 16, 1988 WL 15505 (6th Cir.1988) (Unpublished Disposition) (where impartial jury impaneled, failure to seek change of venue did not constitute ineffective assistance of counsel); *Durham v. Blankenship*, 461 F.Supp. 492, 501 (W.D.Va.1978) (counsel who failed to present merely cumulative evidence in support of change of venue motion was not ineffective).

### 22. Ineffectiveness of Counsel re. Jury Sequestration

Petitioner claims that his trial counsel failed to handle their jury sequestration motion with constitutionally necessary competence. This issue was not raised on direct appeal.

This issue was asserted in petitioner's post-conviction relief petition. Exh. M at 15–16, Bates # 453—454. In support of that claim, the petitioner referred to pretrial motions for 1) individualized voir dire, *id.* # 662—666, which was granted with regard to questioning about the death penalty and pretrial publicity, *id.* # 670, and 2) sequestration of the jury during the trial, *id.* # 671—675, which was denied.

The petitioner claimed in his post-conviction petition that, though his trial attorneys had submitted some articles in support of their sequestration motion, they had not submitted other articles and recordings of broadcasts for the court's consideration. This, they contended, constituted ineffective assistance of counsel.[10]

---

**10.** The petitioner has never asserted that his trial attorneys mishandled issues relating to

■ The trial court held that consideration of this issue was foreclosed from post-conviction review on the basis of res judicata. Exh. P at 3–4. No appeal was taken from this ruling. Due to his defaults, petitioner cannot be heard on the merits of this claim in this proceeding. *Wainwright, supra; Murray, supra.*

Even if this claim could be considered on its merits, there is no basis for relief. Had counsel not filed any motion to sequester, it is not likely that their performance could have been faulted:

> [W]e cannot find that counsel was inadequate for failing to move to have the jury sequestered during trial. The trial court often admonished the jury to avoid reading newspaper articles or listening to radio reports regarding the trial. Petitioners have shown only that one newspaper story appeared each day for the duration of the trial. They have not shown that the court's admonitions were inadequate or that any juror disregarded those admonitions. We therefore find no basis for concluding that trial counsel's conduct fell below a minimum standard of competency.

*United States ex rel. Link v. Lane,* 811 F.2d 1166, 1172 (7th Cir.1987):

> Assuming, nonetheless, that petitioner's lawyers performed incompetently when they failed to provide additional materials in support of their motion, the petitioner has not shown that the trial judge would have ruled in his favor. *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (determinative question is whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"); *cf. Odle v. Calderon,* 919 F.Supp. 1367, 1387 (N.D.Cal.1996) (no prejudice where peti-

tioner did not show that inclusion of additional material in motion for change of venue might have resulted in a favorable ruling). There is nothing in the record to even suggest remotely that, had trial counsel's motion to sequester been more fulsome, it would have been successful.

### 23. Ineffectiveness re. Motion for Jury Consultant

■ The petitioner claims that his trial counsel ineffectively presented a motion for funds for a jury consultant to assist during voir dire. Petitioner did not appeal the denial of this motion on direct appeal. He asserted this claim in his post-conviction petition. The trial court denied the claim on the basis of res judicata. Exh. P at 3–4. The petitioner did not appeal that ruling. Due to his defaults, petitioner cannot be heard on the merits of this claim in this proceeding. *Wainwright, supra; Murray, supra.*

■ In any event, the claim is without merit. There is no constitutional right to obtain the services of experts at state expense. As the court stated in *Moore v. Kemp,* 809 F.2d 702, 712 (11th Cir.1987), the pertinent cases

> hold that a defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. Rather, a fair reading of these precedents is that a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense.

(footnotes omitted).

In addition, the court in *Moore* pointed out:

possible noncompliance by the jurors with the trial judge's admonitions, Tr. 231, 1721, 1815, 1931, 2014, 2204, 2400, during the trial to

refrain from exposure to media accounts about the trial.

Requiring trial courts, both state and federal, to provide for expert assistance—through direct appointment or a grant of funds—would place a substantial, if not onerous, burden on the administration of criminal justice. For example, the trial court would have to (1) appoint a defense expert for every expert available to the government; (2) provide for expert assistance whether or not such assistance turned out to be needed; and (3) provide for any additional experts the appointed experts might need to explore theories that could aid the defense in crossexamining prosecution witnesses or in presenting the defense's case. We question the wisdom of such due process requirements absent a substantial showing, such as the one made in *Ake*, of a significant benefit to the truth-seeking function of a trial.

*Id.* at 712 n. 8.

The Sixth Circuit has applied *Moore* in a habeas corpus case in which the petitioner had unsuccessfully sought state funds to employ a serologist. *Thacker v. Rees*, 841 F.2d 1127, 1988 WL 19179, *8 (6th Cir. 1988) (Unpublished Disposition). After quoting *Moore*, the court stated:

our review of the trial court's decision must focus on the showing made as to the necessity of an expert, the type of expert required, how the expert would be useful, and also that a reasonable probability exists that denial of expert assistance would result in a fundamentally unfair trial. Here, petitioner's counsel "offered little more than undeveloped assertions that the requested assistance would be beneficial. . . ."

Petitioner's counsel made no showing that an expert would assist the defense or that without expert assistance his client would be denied a fundamentally fair trial. Defense counsel's statement to the trial court that without his own expert he was incompetent to cross-examine the prosecution's expert is also insufficient. It is undisputed that defense counsel had access to the results and reports of the prosecution's serologist. As a result, defense counsel had prior notice as to the nature of the state serologist's testimony.

(Citations omitted).

Here, to be sure, the petitioner focuses on the alleged inadequacy of the showing made by his trial counsel in support of the request for funds to retain a jury consultant. Any deficiency in the extent or quality of such showing is not relevant, however, absent a right to use jury consultants. Such right, quite simply, does not exist, no matter how useful some lawyers may believe such consultants to be. There is no basis on which the petitioner can contend that his right to a fundamentally fair trial was abridged by the trial court's decision not to expend funds to enable his counsel to retain a jury consultant.

## 24. Impairment of Right to Counsel Due to Denial of Motion for Funds for Independent Mental Examination.

The petitioner claims that his right to counsel was improperly impaired by the trial court's refusal to grant his request for funds with which to employ an independent psychologist to conduct a confidential mental examination. He did not raise this claim on direct appeal, and it was denied on post-conviction review on the basis of res judicata. *State v. Frazier*, 1997 WL 764810, *6–7 (Ohio App. 8 Dist. 1997). This claim, accordingly, cannot be considered on its merits in this proceeding. *Wainwright, supra.*

In any event, for the reasons stated in subsection 20, *supra*, petitioner did not have a right to have state funds expended to enable him to obtain the services of an independent psychologist to prepare a con-

fidential report. Consequently, his right to counsel was not impaired.

Moreover, as pointed out in *United States v. Osoba*, 213 F.3d 913 (6th Cir. 2000), a claim "that the denial of the funds caused [the defendant] to suffer the ineffective assistance of counsel in violation of the Sixth Amendment" is "meritless." Such claim, the court noted, "alleges only that his counsel was denied the opportunity to pursue the psychological defense due to the court's denial of funds, not that counsel was ineffective in its own right." *Id.* at 917. This ruling suffices to overrule the petitioner's claim of ineffective assistance of counsel, were it properly before this court on its merits.

### 25. Prosecutor's Closing Argument

The petitioner claims that his right to a fair trial was denied when the prosecutor made improperly prejudicial statements during his closing argument. The respondent claims that this issue was not presented on direct appeal, and thus is waived. The petitioner asserts that he presented the issue on direct appeal.

It appears from an examination of the petitioner's brief on direct appeal, Exh. D Bates # 65–68, and the appellate court's decision, *State v. Frazier*, 1994 WL 50703, *11 (Ohio App. 8 Dist.1994), that the petitioner presented a portion of his present claim for appellate review: namely, that the prosecutor engaged in prejudicially improper closing argument during the sentencing phase.

Some portions of the argument which the petitioner challenged on appeal and which he challenges here already have been discussed in subsection 7, *supra.* That discussion, which will not be repeated here, included the prosecutor's reference to the petitioner as a rapist and reference and allusions to evidence outside the record.

Only the claim that the prosecutor misstated the burden of proof is unique to the instant claim. This claim is based on the prosecutor's statement that "People take weights and they take a pound and they put a pound on one side, a pound over here, and if they both have a pound and weigh equal, the scale is balanced." Tr. 2747. The court sustained defense counsel's objection to this statement. There is no reason to believe that the jury disregarded that decision, or allowed the prosecutor's statement to override the judge's instructions as to the burden and standard of proof.

### 26. Denial of Motion for Change of Venue

The petitioner claims that his right to fundamental fairness and an impartial jury was denied when the trial court denied his motion for a change of venue. In response to the fact that each of the seated jurors stated that he or she could provide a fair trial, regardless of pretrial publicity, the petitioner claims that "it is inevitable that they were tainted beyond any ability of the defense to correct their impressions."

 This is an insufficient basis on which to overcome the presumption of correctness that attaches under 28 U.S.C. § 2254(d) to state court findings that jurors can be impartial despite pretrial publicity. *Patton v. Yount*, 467 U.S. 1025, 1037 n. 12, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (whether juror can lay aside his opinion and render a verdict based on the evidence "is a determination to which habeas courts owe special deference"); *Kordenbrock v. Scroggy*, 680 F.Supp. 867, 887 (E.D.Ky.1988), *rev'd on other grounds en banc*, 919 F.2d 1091 (6th Cir.1990) ("Great deference must be awarded to the trial judge who heard the voir dire and who could observe the demeanor of the veniremen.").

Even if the petitioner could be deemed to have overcome the presumption of correctness that attaches to the state court's

findings of impartiality as to each of the seated jurors, the petitioner could not prevail on this claim.

In *Murphy v. Florida*, 421 U.S. 794, 800–03, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the Supreme Court defined the characteristics of a panel of fair and impartial jurors in the face of media publicity. Total ignorance of the allegations against the defendant and other aspects of the case is not required. Thus, as the Supreme Court had earlier stated in *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961):

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Where, as in this case, seated jurors state that any preconceived opinions can be put aside, the petitioner must, the Court stated in *Murphy*, demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." 421 U.S. at 800, 95 S.Ct. 2031. No such demonstration has been attempted or made by petitioner in this case.

Even though the petitioner has not met his burden under *Murphy*, I have examined the materials submitted by the petitioner in support of his pretrial motion in limine to determine whether the "adverse pretrial publicity... create[d] such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton, supra*, 467 U.S. at 1031, 104 S.Ct. 2885 (*discussing Irvin, supra*). Under *Nevers v. Killinger*, 169 F.3d 352, 366 (6th Cir.1999), such review encompasses "not only the media coverage itself but the substance of the jurors' statements at voir dire in determining whether there was a 'community-wide sentiment' against the defendant."

The newspaper accounts presented in support of the motion in limine do not raise a presumption of prejudice. Many of the clippings come from papers published outside of Cuyahoga County, where petitioner's trial occurred. The petitioner has made no showing of the circulation in Cuyahgoa County of the out-county papers. The likelihood that they came to the attention of any of the prospective jurors would appear to be extremely slight. Certainly the petitioner has not met his burden of showing that they had an impact on the members of the venire or the jurors selected for trial. Those clippings shall, accordingly, be disregarded.

The clippings that come from papers published in Cuyahoga County are factual accounts, as in *Murphy, id.* at 802, 95 S.Ct. 2031, of the events in the case as they developed. The clippings can generally be divided by subject according to those events: 1) the crime (Exh M, Bates # 469); 2) the search for, *id.* # 511, and arrest of the petitioner, *id.* # 488; 3) release of other suspects, *id.* # 491; the victim's funeral, *id.* # 507; petitioner's indictment, *id.* # 514; results of paternity testing showing that the petitioner was likely to have been the father of the victim's child, *id.* # 530; denial of petitioner's request for bail *id.* # 532; denials by the Hells Angels of any relationship with the petitioner, who was a former member of that organization, *id.* # 639; relationship between the pending rape charge against the petitioner and the murder charge, *id.* # 541; petitioner's alleged efforts to obtain a plea bargain, *id.* # 547; events at petitioner's Medina County rape trial, including disclosure of his association with the Hell's Angels, *id.* # 551, the playing of

a recording of an interview between Tiffany and an investigator, *id.* # 558, testimony by another witness that the petitioner had raped her, *id.* # 564, and his conviction, *id.* # 569); the clearing of a person suspected of obstructing the search for the petitioner, *id.* # 572, # 573; setting of the petitioner's trial date on the murder charge, *id.* # 575; statements by the defense attorneys about the weakness of the state's evidence, *id.* # 577; and the denial of petitioner's motion to suppress his statement to investigators in which he offered to plead guilty. *Id.* # 578.

The last of these articles appeared on July 30, 1991.[11] Voir dire began the preceding day. In her general instructions at the outset of voir dire, the trial judge informed the prospective jurors that they must be as free "as humanly possible from any sympathy, prejudice, bias or favoritism for either side." Tr. Vol III at 219.

Some of the seated jurors had either no awareness (Smith, Tr. 475; Ballard, Tr. 655; Coffey, Tr. 781) or no recollection about the case. (Barnette, Tr. 299; Evans, Tr. 111; Holloway, Tr. 636). Other seated jurors' recalled "the name" (Stansberry, Tr. 502); only that the event had occurred (Anderson Tr. 217; Sekerak, Tr. 527; Hardwick, Tr. 646; McNulty, Tr. 700; Jackson, Tr. 710; Merriman, Tr. 758); Tiffany was to testify against the petitioner (Hajek, Tr. 273), the pending charge was for rape (McGinty, Tr. 763); there were multiple stab wounds (McGinty, Tr. 763 the discovery of a footprint (Hajek, Tr. 277)), the petitioner had been captured (Pistillo, Tr. 773). All the jurors agreed that they could disregard whatever they may have heard.

Although there was considerable pretrial publicity about the crime and arrest and charges against the petitioner, the trial

court's implicit finding that it had seated an impartial jury is entitled to deference. The presumption of correctness as to that finding has not been overcome. In any event, on review of the record of the pretrial publicity and the subsequent voir dire (which displayed the jurors' nearly unanimous and almost complete ignorance about the case), I am persuaded that the finding of actual impartiality is correct.

## 27. Failure to Sequester the Jury

 The petitioner claims that he was denied his right to a fair trial and an impartial jury when the trial court refused to sequester the jury. The petitioner did not assert this claim on direct appeal. It is, therefore, foreclosed under *Wainwright, supra,* and *Murray, supra,* from consideration on its merits.

 Even if this claim could be considered on its merits, the petitioner is not entitled to relief, because "there is no federal constitutional right to jury sequestration." *King v. Elo,* 2000 WL 791721, *8 (E.D.Mich.2000) (*citing Powell v. Rose,* 581 F.Supp. 60, 63 (M.D.Tenn.1983)). As in *King,* "[t]he trial court's failure to sequester the jury here did not deprive petitioner of due process, where the trial court instructed the jury to avoid reading, listening, or watching the media coverage of the case and there was no evidence that the jury had been tainted by the publicity." *Id.* The trial court frequently reminded the jurors that they were not to have any exposure to articles or broadcasts about the trial. Tr. 231, 1721, 1815, 1931, 2014, 2204, 2400,

 Challenges to a trial court's decision not to sequester a jury raise, moreover, issues of state law. *Hughes v. Foltz,* 762 F.2d 1008, 1985 WL 13168, *2 (6th

---

**11.** The petitioner submitted several later articles as exhibits to his post-conviction petition. These, being published after the trial jury had

been selected, could have had no bearing on the motion for change of venue.

Cir.1985) (Unpublished Disposition). Thus, absent "demonstrated prejudice, failure to sequester the jury does not warrant federal habeas corpus relief." *Id.* The petitioner's conclusory speculation that "it was impossible that [the jurors] avoided discussion of the case or the vast amount of pretrial publicity which surrounded them," Doc. 8, at 87, is not "demonstrated prejudice."

The petitioner likewise speculates that the jurors violated the trial judge's admonitions to refrain from exposure to media stories about the trial. This is not a sufficient basis for relief:

> "[w]here a jury has been clearly admonished not to read newspaper accounts of the trial in which they are serving as jurors, it is not to be presumed that they violated that admonition." Thus, even when material presented by the news media is prejudicial to the defendant, absent a showing that the jury violated the admonishment, a conviction will not be reversed.

*United States v. Metzger,* 778 F.2d 1195, 1209 (6th Cir.1985) (citation omitted). *Accord, United States v. Elder,* 90 F.3d 1110, 1130 (6th Cir.1996); *see also Lupino v. Tahash,* 252 F.Supp. 225, 228 (D.Minn. 1966) (even where there has been substantial publicity, prejudice will not be presumed).

Like the petitioner in *Drake v. Clark,* 14 F.3d 351, 358 (7th Cir.1994), the petitioner here has not met his burden of establishing a factual basis for relief:

> [Petitioner] contends the trial court's failure to sequester the jury denied him a fair trial because the jurors may have been exposed to publicity (newspaper articles) concerning the trial. "Sequestration is an extreme measure, one of the most burdensome tools of the many available to assure a fair trial." [The state] entrusts the decision of whether to sequester a jury to the sound discretion of the trial court.
>
> [Petitioner] has failed to establish he was denied a fair trial by the trial court's failure to sequester the jury. Drake's claim that the jurors were exposed to newspaper articles concerning the trial is unsupported by evidence in the record. In fact, the trial court questioned the jurors about whether they had read newspaper accounts of the case or heard about the case on the radio or television and the jurors indicated that they had not had any contact with these possible types of influence.

(Citations omitted).

## 28. Waiver of Objection to Error in the Charge

The petitioner claims that his trial counsel provided constitutionally insufficient assistance when he waived objection to how the trial judge read a portion of the charge during the penalty phase. After describing aggravating and mitigating circumstances and the weighing process and defining proof beyond a reasonable doubt, the trial judge told the jurors:

> If all 12 members of the jury find by proof beyond a reasonable doubt that the aggravating circumstances, which the defendant was found guilty of committing, outweigh any mitigating factor, then you must return such finding to the Court.
>
> I instruct you, as a matter of law, that if you make such a finding, then you have no choice and you must *recommend* to the Court that the sentence of death be imposed upon the defendant, Richard Frazier.

Tr. 2814 (emphasis supplied).

After the charge had been read, defense counsel pointed out to the judge that she had "said recommend," and she acknowledged that she had done so, saying, "It

was inadvertent on my part." Tr. 2817. On agreement of the parties, the judge changed the written version of the instructions which she was sending to the jury room. Apparently the court and counsel had agreed prior to the reading of the instructions that the judge would not use the term "recommend" in the charge. *Id.*

■ The petitioner claims that his trial counsel improperly agreed to this procedure, claiming that it constituted a waiver of his right to have the jury understand its proper role in the ultimate sentence. According to the petitioner, telling the jurors that they "recommend" a death sentence violated the Supreme Court's decision in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Under *Caldwell,* the jurors cannot be given a mistaken impression that their verdict is merely a recommendation, and that the ultimate responsibility for determining the defendant's sentence rests elsewhere. 472 U.S. at 329, 105 S.Ct. 2633.

■ Petitioner did not present this claim to the Ohio courts. It is, accordingly, waived under *Wainwright, supra,* and *Murray, supra,* and need not be considered on its merits.

In any event, the claim is without merit because the trial judge's charge was a correct statement of Ohio law, and does not contravene the *Caldwell* doctrine.

■ Under Ohio law the jury is required to recommend a death sentence if it concludes that the evidence of aggravating circumstances outweighs evidence of mitigating circumstances. O.R.C. § 2929.03(D)(2). For a death sentence to be imposed, the trial judge must also reach the same conclusion. O.R.C. § 2929.03(D)(3). If, however, the jury concludes that a life sentence is appropriate, its decision is binding. O.R.C. § 2929.03(D)(2). Thus, under Ohio law, a jury's death verdict is, in fact and law, a

recommendation—just as the jury was told—which the trial judge must independently accept before a death sentence can be imposed. Ohio has placed the final decision in the hands of the court. *Mapes v. Coyle,* 171 F.3d 408, 415 (6th Cir.1999) (informing jurors that their recommendation is only a recommendation "is an accurate statement of Ohio law").

Because the jury was given an accurate, rather than a misleading statement of the allocation of ultimate responsibility, no error resulted from the trial judge's instruction. *Scott v. Mitchell,* 209 F.3d 854, 877 (6th Cir.2000) ("*Caldwell* is limited to situations in which the jury is misled as to its role"); *Mapes, supra,* 171 F.3d at 415 (" 'to establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.' ") (*citing Romano v. Oklahoma,* 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994)).

There was, accordingly, no error in the charge as given, even if its text included language that the parties and court had agreed would not be included. There being no error in the charge, counsel was not ineffective when he declined to object to the procedure adopted by the judge in response to her inadvertence.

### 29. Errors in the Penalty Phase Jury Charge

The petitioner claims that the court's charge during the penalty phase incorporated three errors, each of which entitles him to a new sentencing hearing. According to the petitioner, the trial judge improperly 1) stated there was only one mitigating factor (namely, residual doubt); 2) required unanimity as to mitigating factors; and 3) instructed the jurors that reasonable doubt would be present where the jurors could not be convinced of the "truth of the charge."

■ ] These issues were not raised on appeal. They are, accordingly, foreclosed from consideration on their merits in this proceeding under *Wainwright, supra,* and *Murray, supra.*

In any event, the claims are without merit.

Contrary to the petitioner's assertion, the trial record does not show that the court instructed the jury that there was only one mitigating factor. It made clear that the jury could consider in mitigation "Any other factors that are relevant to the issue of whether the offender should be sentenced to death." Tr. 2812. The court then pointed out—by way of explanation, rather than limitation—that the petitioner had asserted that residual doubt exists. Finally, the court noted that the petitioner had the burden of proof on this issue of mitigation. Nothing in the court's charge can fairly be construed as limiting the jury's consideration of mitigating factors.

There is, contrary to the petitioner claim that the trial judge instructed the jury that any finding of mitigating factors had to be unanimous, no such instruction in the record. The judge told the jury that their finding as to aggravating circumstances had to be unanimous. Tr. 2814. She gave no similar instruction with regard to mitigating factors.

In any event, any understanding that the jury may have had that it had to be unanimous in its decision to return a life sentence (the only alternative available to it other than a death sentence) would not have been improper. *Coe v. Bell,* 161 F.3d 320, 337 (6th Cir.1998). In *Coe,* the Sixth Circuit found no error where the jury was instructed that, for both a death verdict and a life imprisonment verdict, the decision had to be unanimous.

Finally, no error resulted from the trial court's statement, in defining reasonable doubt, that such doubt was present when "you cannot say that you are firmly con-

vinced of the truth of the charge." In context, the "charge" to which the court was referring was the contention, as to which the jurors were told the state had the burden of proof, "that the aggravating circumstances that the defendant was found guilty of committing *outweigh any factors in mitigation* of the imposition of the death sentence." (Emphasis supplied).

### 30. Failure to Use Jury Interrogatories

The petitioner claims that the trial court committed constitutional error when it used a single verdict form on which the jurors were to record their verdict for death or life. This claim was not raised on appeal, and cannot be considered on its merits in this proceeding. *Wainwright, supra; Murray, supra.*

■ In any event, the claim is without merit. There is no constitutional right to jury interrogatories. *See Griffin v. United States,* 502 U.S. 46, 48–49, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (due process not violated with use of single verdict re. multi-object conspiracy charge); *United States v. Console,* 13 F.3d 641, 663 (3rd Cir.1993) (trial court has discretion to submit a single verdict or interrogatories); *United States v. Smith,* 938 F.2d 69 (7th Cir.1991) ("While special interrogatories or verdicts are generally not favored in criminal cases, they are permitted.").

### Conclusion

In light of the foregoing review and consideration of each of the petitioner's claims on its merits, including those several claims as to which such review is foreclosed as a result of procedural default, I conclude that the petitioner is not entitled to habeas corpus relief.

It is, accordingly, hereby

ORDERED THAT the petition for a writ of habeas corpus be, and the same hereby is denied.

So ordered.

**JUDGMENT ENTRY**

For the reasons stated in the ORDER filed on January 5, 2001

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that

1. The petition for a writ of habeas corpus be, and the same hereby is denied.

2. Case closed.